WALTER J. LACK, ESQ., State Bar No. 57550
*wlack@elllaw.com*
PAUL A. TRAINA, ESQ., State Bar No. 155805
*ptraina@elllaw.com*
JARED W. BEILKE, ESQ., State Bar No. 195698
*jbeilke@elllaw.com*
**ENGSTROM, LIPSCOMB & LACK**
A Professional Corporation
10100 Santa Monica Blvd., 12th Floor
Los Angeles, California 90067-4113
Tel: (310) 552-3800 / Fax: (310) 552-9434

FILED
CLERK, U.S. DISTRICT COURT

AUG 2 1 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

MICHAEL I. LEONARD (Moving *Pro Hac Vice*)
*mleonard@leonardlawoffices.com*
LEONARD LAW OFFICES
203 N. LaSalle Street, Suite 1620
Chicago, Illinois 60601

Attorneys for Plaintiff/Relator

**UNITED STATES DISTRICT COURT FOR THE**

**CENTRAL DISTRICT OF CALIFORNIA**

UNITED STATES OF AMERICA
*EX REL.*, FOX RX, INC., AS
RELATOR UNDER THE FEDERAL
FALSE CLAIMS ACT,

          Plaintiff/Relator,

      v.

MANAGED HEALTH CARE
ASSOCIATES, INC.; MHA LTC, INC.;
and DOES 1 through 10,

          Defendants.

CASE NO. **CV13-06154**-*GAF*
*(PJW)*

*QUI TAM* ACTION

**COMPLAINT FOR:
DAMAGES AND CIVIL PENALTIES
FOR VIOLATIONS OF THE
FEDERAL FALSE CLAIMS ACT**

**JURY TRIAL DEMANDED**

**FILED UNDER SEAL**
*(31 U.S.C. §§ 3729-3733, et seq.)*

380661

1

*QUI TAM* COMPLAINT

The United States of America, the District of Columbia, and the States of California, Florida, New Jersey, New York, and Texas (collectively, "the States"), by and through *qui tam* Relator, Fox Rx, Inc. ("Fox," "Plaintiff," or "Relator") bring this action under the Federal False Claims Act, 31 U.S.C. § 3729-3733, *et seq.* ("FCA"), and under the States' False Claims Acts as enumerated below, against Defendant, Managed Health Care Associates, Inc., and its wholly owned subsidiary, MHA LTC, Inc. (collectively as "MHA"), to recover all damages, penalties, and other remedies provided for by the FCA and the States' False Claims Acts, and for their Complaint allege and state as follows:

## I.   INTRODUCTION

1.   MHA is one of the largest companies providing pharmacy services to long-term care facilities ("LTCFs"), including to nursing homes.

2.   Specifically, MHA contracts with private insurers who in turn contract with, and are reimbursed by, the Federal Government pursuant to Medicare Part D ("Part D") to provide prescription drugs through MHA's network of independent pharmacies to beneficiaries of those Part D Plans.  The Relator in this case, Fox, is one of those private insurers, known as a Medicare Part D Plan Sponsor or "PDP."

3.   As described in detail below, since the commencement of the Part D program in 2006, MHA, putting profit above the well-being of LTCF residents, has intentionally, routinely, systematically, recklessly, and illegally submitted and caused to be submitted to the United States, materially false records and statements relating to its pharmacies' harmful, dangerous and illegal dispensing of atypical antipsychotic drugs to Medicare and Medicaid recipients belonging to the Medicare Part D Plan sponsored by the Relator or to the hundreds of other PDPs throughout the United States and in the Commonwealth of Puerto Rico whose members are residents of LTCFs.

4.   In short, from January 1, 2006 to the present, MHA has employed a fraudulent scheme to improperly and illegally submit claims for atypical antipsychotic drugs that are medically unnecessary and more importantly, harmful.  In so doing, MHA failed to fulfill its obligations at the point of service to oversee the use of antipsychotic pharmaceuticals in the

1  vulnerable elderly population it serves, thus violating applicable Federal statutes, Federal rules
2  and regulations, CMS instructions, State pharmacy laws, and material contractual provisions
3  relating to its dispensing of drugs to Part D beneficiaries.

4       5.     Moreover, MHA attempted to camouflage its illegal scheme by: failing to
5  disclose to the United States or the PDP's, the astronomical and illegal kickbacks it received in
6  the form of "rebates" from the manufacturers of atypical antipsychotic drugs, and by waiving,
7  or failing to collect, co-payments from beneficiaries. Those co-pays would have raised red-flags
8  regarding MHA's illegal practices.

9       6.     As a direct and foreseeable result of the Defendants' improper and illegal
10  practices, Federal health insurance programs have been materially impacted and financially
11  damages by Defendants' submission of false and fraudulent Part D claims.

12  **II.**   **PARTIES**

13       7.     Relator, Fox Rx, Inc., is a Delaware corporation and the parent corporation of
14  Fox Insurance, Inc. (collectively, "Fox"), also a Delaware corporation.  During the time period
15  from 2006 to 2010, Fox Insurance, Inc. was engaged in the business of sponsoring PDPs.

16       8.     Fox, through its review and intimate understanding of claim-specific data
17  submitted to it and its agents, and through its expertise with respect to mental health issues in
18  LTCF and other settings, is the original source of the allegations and transactions alleged in this
19  Complaint.  Indeed, Fox relies upon its own data in support of these allegations.

20       9.     Plaintiff, the United States of America, acting through the Department of Health
21  and Human Services ("HHS") and its Centers for Medicare and Medicaid Services ("CMS"),
22  administers the Health Insurance Program for the Aged and Disabled established by Title XVIII
23  of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare"), and the Grants to States for
24  Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§
25  1396 *et seq.* ("Medicaid").

26       10.    The States participate in the Medicaid program and each of them has also adopted
27  its own State False Claims Acts similar to the FCA.

28

11.     Defendants Managed Health Care, Inc., and its wholly owned subsidiary MHA LTC, Inc., are privately held New Jersey corporations with their corporate headquarters located in Florham Park, New Jersey.

12.     According to MHA's website, "[w]ith a clear understanding of industry changes with Medicare Part D, our management team created the Long-Term Care (LTC) Pharmacy Network in 2006 to assist long-term care pharmacies and prescription drug plans (PDPs) with managing LTC Medicare Part D claims.  More than a third of all such claims in the US now flow through the MHA network."  *See*  http://mhainc.com/templates/c3-l2.aspx?id=53&terms=LTC.

13.     MHA further states on its website that:

> More than 1,100 long-term care pharmacies are enrolled in the MHA Long-Term Care Pharmacy Network — a number that continues to grow as new pharmacies are added.

> For these members, MHA network contracts provide access to more than 90 percent of benchmarked PDPs and more than 95 percent of Medicare Advantage–Prescription Drug (MA–PD) plans in the country.

**Benefits of membership**

> Members of the MHA Long-Term Care Pharmacy Network benefit from multiple efficiencies: access, administrative, data and reporting, reimbursement, and more.

> •     Access to the PDPs and MA–PDs to which your patients subscribe.

> •     Contracted reimbursements at long-term care rates and multi-year terms, with additional performance-based reimbursements for formulary management and generic therapy management.

> •     Review of the impact of Medicare Part D with your account-dedicated team, including comprehensive formulary management reporting.

> •     Net-Rx provides operational and technical services exclusively for LTC pharmacies by helping these organizations to lower operational costs, increase profitability and provide industry specific solutions. Net-Rx's portfolio of products includes drug pricing services, claims reconciliation, transaction services, 340B services, pharmacy operations, offsite data back-up, networking and managed security.

> •     With RxPertise software from MHA, the ability to determine coverage and locate covered therapeutic alternatives quickly with the Prescription

*QUI TAM* COMPLAINT

Drug Plan Formulary Checker.

*See* http://mhainc.com/templates/c3-l2.aspx?id=49&terms=LTC

## III.   JURISDICTION AND VENUE

14.     Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

15.     This Court can exercise personal jurisdiction over the Defendants, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. §§ 3729 *et seq.*, and complained of herein took place in part in this District and the Defendant regularly transacted business in this District.  For example, MHA contracted with pharmacies located in this District that were used to carry out MHA's scheme.

16.     Jurisdiction in this Court over all related State laws alleged herein is proper under 31 U.S.C. § 3732(b).

17.     Pursuant to 31 U.S.C. § 3730(b)(2), the Plaintiff prepared, and has served with this Complaint upon the Attorney General of the United States, the United States Attorney for the Central District of California, and the Attorneys General of each of the Plaintiff States to this action, a written disclosure of all material evidence and information currently in its possession.  That disclosure is supported by material evidence known to the Relator at the time of the filing of this action establishing the existence of Defendants' violations of the FCA. Because those disclosures include attorney-client communications and work product, and were submitted to those Federal officials in their capacity as potential co-counsel in the litigation, the Relator understands those disclosures to be confidential and exempt from disclosure under the Freedom of Information Act.  5 U.S.C. § 552; 31 U.S.C. § 3729(c).

18.     The allegations and transactions alleged herein have not been publicly disclosed. Fox is an original source of the allegations and transactions in this lawsuit.  Fox has also voluntarily provided the information to the Government before filing an action under this section.

19.     Pursuant to 31 U.S.C. §3731(b)(1)(2), this FCA Complaint is initiated within the applicable statute of limitations.

## IV.   ALLEGATIONS COMMON TO ALL COUNTS

### A.   The False Claims Act ("FCA")

20.     The FCA, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval a violation of Federal law for which the United States may recover three times the amount of the damages the Government sustains, in addition to a civil monetary penalty of between $5,500 and $11,000 per claim.

21.     The FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim, a violation of Federal law for which the United States may recover three times the amount of the damages the Government sustains, in addition to a civil monetary penalty of between $5,500 and $11,000 per claim.

22.     The FCA defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.   31 U.S.C. § 3729(b)(2).

23.     The FCA, 31 U.S.C. § 3729(b)(1), provides that "(1) the terms 'knowing' and 'knowingly' – (A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) requires no proof of specific intent to defraud."

24.     The FCA, 31 U.S.C. § 3729(b)(4), provides that "(4) the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."

25.     As described in detail below, MHA violated the FCA through the fraudulent submission of claims to CMS for excluded atypical-antipsychotic drugs to Part D beneficiaries.

MHA knowingly caused to be submitted Part D claims for atypical antipsychotics that were not covered by Part D because the use for which they were prescribed was not approved by the FDA or was not a "medically accepted indication" as set forth in at least one of the three statutorily recognized "Compendia." MHA also knowingly caused to be submitted Part D claims for atypical antipsychotic drugs that were not covered by Part D because they were the result of illegal kickbacks paid to MHA and offered by MHA.

26.   Each of the Plaintiff States to this action has adopted a False Claims Act that provides comparable relief to them for the submission of false and fraudulent claims. These State False Claims Acts include:

a.   California: Cal. Government Code § 12650, *et seq.*;

b.   Florida: Fla. Stat. § 68.081, *et seq.*;

c.   New Jersey: N.J. St. Fin. Law § 187, *et seq.*;

d.   New York: N.Y. State Finance Law § 189, *et seq.*;

e.   Texas: Tex. Hum. Res. Code § 32.039, *et seq.*, and § 36.001, *et seq.*;

**B.   Background**

**1.   The Medicare Part D Program: Prescription Drug Coverage**

27.   Medicare is a federally funded and administered health insurance program for certain groups of persons, primarily the elderly and the disabled. HHS administers the Medicare program through its sub-agency, CMS.

28.   Medicare Part D, a voluntary prescription drug benefit program for Medicare enrollees, became effective on January 1, 2006. *See* 42 U.S.C. 1395w-101, *et seq.*

29.   Unlike coverage in Medicare Parts A and B, Medicare Part D coverage is not provided within the traditional Medicare program. Instead, Medicare beneficiaries must affirmatively enroll in one of the many hundreds of Part D Plans offered by private companies, known as "Part D Sponsors," who contract with CMS to administer prescription drug plans ("PDPs"). *See* MMA, Sections 1102, 1860D-1 through 1860D-42, and 1871 of the Social Security Act; 42 U.S.C. §§ 1302, 1395w-101 through 1395w-152, and 1395hh.

30.   A Medicare Part D Plan Sponsor (hereinafter, "Sponsor," "PDP Sponsor," or

*QUI TAM* COMPLAINT

"Part D Sponsor") is an entity that is certified as meeting the requirements of Part D and which has contracted with CMS to provide Part D benefits  *See* Section 1860D-41, 42 U.S.C. § 1395w-151(a)(13) and (14)(B).  The term "Part D Sponsor" also includes employer and union-sponsored Plans that offer qualified Part D prescription coverage.  *See* 42 C.F.R. § 423.4.

31.   Under Part D, the process begins with the health insurance company submitting a certified application to CMS to participate as a Part D Plan Sponsor to provide prescription drug coverage to qualifying Part D Plans.  *See* 42 C.F.R. §§ 423.502, 423.265 and 423.272. That application is a prerequisite for contracting with CMS as a Part D Plan Sponsor.  *Id.* at 42 *C.F.R.* §423.504(b).

32.   The Part D Plan Sponsor must also expressly agree to comply with the requirements and standards of Part D and all the terms and conditions of payment.  *See* Section 1860D-12, 42 U.S.C. § 1395w-112(b)(1).

33.   The contract between the Part D Plan Sponsor and CMS must include the elements listed in 42 *C.F.R.* § 423.505(b), including compliance with the reporting requirements as set forth in § 423.514 and the requirements set forth in § 423.329(b) for submitting drug claims and related information to CMS for its use in risk adjustment calculations.  The Part D Plan Sponsor must also expressly agree to provide CMS with the information CMS determines is necessary to carry out the payment provisions.  *See* 42 C.F.R. § 423.505(b)(8) and (9).

34.   A Part D Plan Sponsor, in contracting with CMS, also expressly "agrees to comply with Federal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law [and] the False Claims Act (32 U.S.C. §§ 3729 *et seq.*)."  42 *C.F.R.* 423.505(h)(1).

35.   To qualify for Part D payments from CMS, prior to each Plan year, each approved Part D Plan Sponsor must submit a bid, certified by an actuary, for each Part D Plan it will be offering.  *See* 42 C.F.R. § 423.265.  The bid contains a per member per month ("PMPM") cost estimate to provide Part D benefits to an average Medicare beneficiary in a particular geographic area.  CMS considers both the tiered formulary structure and utilization

1    management program components of the Part D Plan Sponsor's bid. *See* 42 C.F.R. §

2    423.272(a)(2). From those Part D Plan bids, CMS calculates nationwide and regional

3    benchmarks which represent an average per member/per month ("PMPM") cost. If the Part D

4    Plan Sponsor's bid exceeds the benchmark, the Plan Member/beneficiary must pay the

5    difference. Once approved, the Part D Plan Sponsor may market its Plans to eligible Medicare

6    Part D beneficiaries, but CMS also sets restrictions on marketing and enrollment. *See* 42

7    C.F.R. § 423.50.

8        36.    During each benefit year, CMS pays the Part D Plan Sponsor estimated payments

9    on a monthly basis. In turn, the Part D Plan Sponsor provides CMS with documentation of its

10    actual costs. The Part D Plan Sponsor must provide actual cost information to CMS by

11    submitting a Prescription Drug Event ("PDE") record, with drug cost and payment data, for

12    each and every prescription that is filled for its Plan Members/beneficiaries.

13        37.    Once enrolled, each Part D Plan Member pays a monthly premium to the Part D

14    Plan, as determined under the Part D Regulations. *See* 42 C.F.R. §§ 423.153 and 423.293.

15        38.    In the year following each benefit year, CMS reconciles the PDP Sponsor's actual

16    prescription drug costs, as derived from its PDE records, against the Sponsor's prior bid. If the

17    PDP Sponsor's actual costs exceed its estimated costs, the Sponsor may be able to recoup some

18    of its losses through a risk-sharing arrangement with CMS. Conversely, if a Part D Plan

19    Sponsor's estimated costs exceed its actual costs, the Sponsor may have to pay back some of its

20    estimated payments to CMS.

21        39.    Thus, CMS pays the Part D Sponsor under Medicare Part D. The Part D Sponsor

22    then pays the Part D Plan pharmacies for the prescriptions they provided to the Plan Members,

23    less their co-payments.

24        40.    The Part D Sponsor is required to make several crucial and material certifications

25    to CMS regarding its submission of Part D data used for payment, including:

26             a.      Certification of Data that Determines Payment: As a condition for
receiving a monthly payment . . . the Part D Plan Sponsor agrees

27                 that its chief executive officer (CEO), chief financial officer
(CFO), or an individual delegated the authority to sign on behalf of

28

*QUI TAM* **COMPLAINT**

one of these officers, and who reports directly to the officer, must request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of all data related to payment. The data may include specified enrollment information, claims data, bid submission data, and other data that CMS specifies. *See* 42 C.F.R. § 423.505(k)(1).

b.  Certification of Enrollment and Payment Information: The CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that each enrollee for whom the organization is requesting payment is validly enrolled in a program offered by the organization and the information CMS relies on in determining payment is accurate, complete, and truthful and acknowledge that this information will be used for the purposes of obtaining Federal reimbursement. *See* 42 C.F.R. § 423.505(k)(2).

c.  Part D Sponsor Certification of Claims Data: The CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that the claims data it submits under § 423.329(b)(3) (or for fallback entities, under § 423.871(f)) are accurate, complete, and truthful and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement. *See* 42 C.F.R. § 423.505(k)(3).

d.  Certification of Bid Submission Information. The CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that the information in its bid submission and assumptions related to projected reinsurance and low income cost sharing subsidies is accurate, complete, and truthful and fully conforms to the requirements in § 423.265. *See* 42 C.F.R. § 423.505(k)(4).

41.  The Part D Sponsor is required to affirmatively certify the accuracy and completeness of allowable costs for risk corridor and reinsurance information and of data for price comparison that it submits to CMS. *See* 42 C.F.R. § 423.505(k)(5) and (6).

## 2.  First Tier, Downstream, and Related Entities

42.  The Regulations governing Part D benefits define major entities with which a Part D Sponsor may contract. *See* 42 C.F.R. § 423.505(i); *see also*, CMS's Prescription Drug Manual, Chapter 9 - Part D Program to Control Fraud, Waste and Abuse, 40 — Part D Sponsor

Accountability and oversight, p. 12. CMS has described these entities as "pharmacies or other providers, related entities, contractors, subcontractors, first tier and downstream entities."

43.   A "First Tier Entity" is a party with whom the Part D Sponsor has a written contract "acceptable to CMS with a Sponsor or applicant to provide administrative services or health care services for a Medicare eligible individual under Part D," and most typically a Pharmacy Benefits Manager or "PBM." *See* 42 C.F.R. § 423.501; *see also*, CMS's Prescription Drug Manual Chapter 9 - Part D Program to Control Fraud, Waste and Abuse, 40 — Part D Sponsor Accountability and oversight, p. 12. Pursuant to those types of contracts, PBMs work with Part D Sponsors to develop and implement a prescription drug formulary, and to provide automated processing services for Part D Sponsors to "adjudicate" claims submitted by pharmacies on a real-time basis.

44.   Part D Sponsor also enter into contracts with pharmacies (including LTCF pharmacies, such as MHA), either directly or through a PBM contracted with that Part D Sponsor, to provide prescription drugs to their Plan Members. Such pharmacies are referred to as "downstream entities" for the purposes of Part D. *See* 42 C.F.R. § 423.501; *see also*, CMS's Prescription Drug Manual Chapter 9 - Part D Program to Control Fraud, Waste and Abuse, 40 — Part D Sponsor Accountability and oversight, p. 12.

45.   By way of illustration, to accomplish the aims of Part D, a common arrangement is for a Part D Sponsor to enter into a contract with a PBM. The PBM then contracts with participating pharmacies, such as MHA, to provide the actual dispensing services. The pharmacies are thus the "Downstream Entities." If the pharmacies then contract with individual pharmacists, those pharmacists would also be Downstream Entities for the purposes of Part D. *See* CMS Prescription Drug Manual Chapter 9 - Part D Program to Control Fraud, Waste and Abuse, 40 — Part D Sponsor Accountability and Oversight, p. 12.

46.   Fox, as have most Part D Plan Sponsors, contracted with PBMs to process its Part D claims for each of the years from 2006 through 2010.

47.   MHA has contracted with the majority of Medicare Part D Sponsors, including Fox (as discussed in more detail below), either directly or through the PDP Sponsors' PBMs to

provide LTCF pharmacy services to Part D beneficiaries enrolled in those Part D Plans. Indeed, on its website, MHA claims that it has contracted with more than 90 percent of benchmarked PDPs and more than 95 percent of Medicare Advantage–Prescription Drug (MA– PD) plans in the country.  *See* ¶ 13, *supra*.

### 3.    Conditions of Medicare Part D Program Payments

48.    In order to receive Part D funds from CMS, Part D Sponsors, and their authorized agents, employees, and contractors (including PBMs and pharmacies) are required to comply with all applicable federal laws, regulations, as well as with CMS's Instructions.  *See* 42 U.S.C. § 1860D-12(b)(1); 42 C.F.R. § 505(i)(4)(iv).

49.    Medicare Part D specifically requires that PDP Sponsors adhere to all Federal laws and regulations, specifically including those designed to prevent fraud, waste, and abuse. *See* 42 C.F.R. § 423.505(h)(1).

50.    In addition, all First-Tier, Downstream, and Related Entities must similarly comply with all of those mandated requirements.  As the Federal Regulations specify, "[i]f any of the Part D Plan Sponsor's activities or responsibilities under its contract with CMS is delegated to other parties, the following requirements apply to any related entity, contractor, subcontractor, or pharmacy: . . . [a]ll contracts or written arrangements must specify that the related entity, contractor, or subcontractor must comply with all applicable Federal laws, regulations, and CMS instructions."  *See* 42 C.F.R. § 423.505(i)(4)(iv).

51.    In addition, just as the Part D Sponsor must affirmatively certify the data it submits to Medicare, pharmacy providers must similarly certify to the accuracy and truthfulness of the data on each and every claim.  The Federal Regulations provide that:

> If the claims data are generated by a related entity, contractor, or subcontractor of a Part D Plan Sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement.

*See* 42 C.F.R. § 423.505(k)(3).  In sum, pharmacies and PBMs contracting with a Part D Plan (or another PBM) stand in the shoes of the Part D Plan with respect to its obligations under

1 | Part D.

2     52.    In addition to requiring that only accurate and truthful data be submitted for
3 | covered and payable claims, Medicare also requires Part D compliance with a number of
4 | quality assurance and compliance program requirements.  Federal Regulations specifically
5 | require that Part D Sponsors establish quality assurance measures and systems that require the
6 | Sponsor's network providers "to comply with minimum standards for pharmacy practice as
7 | established by the States."  *See* 42 C.F.R. § 423.153(c)(1).  A "network" provider is described
8 | as a pharmacy where enrollees may be expected to obtain covered Part D drugs. *See* 42 C.F.R.
9 | § 423.128(b)(5) and (6).

10     53.    Federal regulations also require that, in order to contract with CMS, a Part D
11 | Sponsor must agree to comply with all applicable State law requirements.  *See* 42 C.F.R.
12 | 423.505(b)(15).

13     54.    The importance of adhering to applicable State laws in the provision of Medicare
14 | Part D prescription drug coverage is also made clear by the Federal Regulations that require, as
15 | a condition precedent to contract as a Part D Sponsor, "Any entity seeking to contract as a Part
16 | D Plan Sponsor must [h]ave administrative and management arrangements satisfactory to CMS,
17 | as demonstrated by at least . . . [a] compliance plan that consists of . . . [w]ritten policies,
18 | procedures, and standards of conduct articulating the organization's commitment to comply
19 | with all applicable Federal and State standards."  *See* 42 C.F.R. 423.504(b)(iv)(A).

20     55.    In addition, Part D Sponsors "must have established quality assurance measures
21 | and systems to reduce medication errors and adverse drug interactions and improve medication
22 | use that include a . . . [r]epresentation that network providers are required to comply with
23 | minimum standards for pharmacy practice as established by the States."  *See* 42 C.F.R.
24 | 423.153(c)(1).

25     56.    Services performed by or delegated by a PDP Sponsor to "First-Tier" entities,
26 | such as PBMs and/or "Downstream" entities, such as pharmacies like MHA and its member
27 | pharmacies, must meet the standards required of the Part D Sponsor, and any contract between
28 | the PDP and the First Tier PBM or Downstream entities, including pharmacies, must reflect

---

13

1   those obligations. *Id.* at §§ 423.505(i)(3)(v), 423.505(i)(4)(iv).

2   57.   MHA has expressly acknowledged all of these obligations in its contracts with
3   PDP Sponsors and/or PBMs who are under contract to administer Part D claims on behalf of
4   the PDP.

5   **4.   Overview of the Medicaid Program**

6   58.   The Medicaid Program, as enacted by Title XIX of the Social Security Act of
7   1965, 42 U.S.C. § 1396, *et seq.*, is a joint Federal-State program that provides health care
8   benefits for certain groups, primarily indigent and disabled individuals. The federal Medicaid
9   statute establishes the minimum requirements for State Medicaid programs to qualify for
10  Federal funding. *See* 42 U.S.C. § 1396a.

11  59.   All of the Plaintiff States to the present action have affirmatively elected to
12  participate in the Medicaid program, and all have elected to offer prescription drug coverage to
13  Medicaid beneficiaries.

14  60.   The Federal portion of each State's Medicaid payments, known as the Federal
15  Medical Assistance Percentage ("FMAP"), is based on a State's per capita income compared to
16  the national average. *See* 42 U.S.C. § 1396d(b).

17  61.   The Medicaid statute requires each participating State to implement and
18  administer a State Plan for medical assistance services which contains certain specified
19  minimum criteria for coverage and payment of claims. *See* 42 U.S.C. §§ 1396, 1396a(a)(13),
20  1396a(a)(30)(A).   These requirements include a comprehensive description of the State
21  Medicaid agency's payment methodology for prescription drugs. *See* 42 C.F.R. § 447.518.

22  62.   Although the MMA transferred prescription drug coverage for dual eligibles to
23  Part D, States are still obligated to finance a portion of the Part D coverage through "clawback"
24  payments to the federal government. Even though States are no longer responsible for covering
25  dual eligibles and do not have control over the cost of coverage, the MMA's clawback
26  provision requires States to pay the Federal Government a significant portion of the money they
27  save by no longer providing prescription drug coverage to dual eligibles. *See* Robert Pear,
28  "States Protest Contributions to Drug Plan," New York Times, Oct. 18, 2005.

380661

14

*QUI TAM* COMPLAINT

63.     Most States continue to include the clawback payments as part of the State Medicaid budget, but these payments are not matched with federal funds and they are not included in calculations of federal Medicaid spending. The federal government accounts for these payments as Medicare revenue. The Congressional Budget Office estimated that the clawback payments from States to the federal government will total $124 billion between 2006 and 2015. *Id.*

### 5.     Antipsychotic Fraud, Waste and Abuse In The LTCFs

#### a.     Background

64.     Many LTCF residents suffer from illnesses, such as dementia, whose behavioral challenges require well-trained and adequate numbers of LTCF staff. Because of the difficulty and cost of dealing with such patients, LTCFs are tempted to, and do, misuse prescription drugs to make residents more "compliant," or, in short, they use these drugs as "chemical restraints."

65.     Certain drugs are frequently misused as chemical restraints. One class of such drugs is collectively known as "atypical antipsychotics."[1] Atypical antipsychotic drugs are approved by the FDA to treat the psychotic symptoms of mental illness. However, atypical antipsychotics also have the effect of making patients for whom there is no FDA-approved use more subdued and compliant and thus easier to manage in an LTCF setting.

66.     The use of medications to treat symptoms or conditions for which the medications have not received FDA-approval is known as "off-label" uses. While it is not per se illegal for a physician to prescribe a medication for an off-label use, it is in fact illegal for drug manufacturers to market and promote drugs for off-label purposes, including, and especially through, the offering of financial incentives to prescribe drugs for off-label uses. It is also illegal for physicians and pharmacists to receive incentives such as kickbacks and rebates to prescribe and dispense drugs for off-label purposes.

67.     Drug manufacturers use "off-label" marketing of atypical antipsychotics to cause the illegal prescribing patterns described herein. These off-label marketing schemes involve

---

[1]   The term "atypical" refers to the now-rejected belief that unlike "typical" or first-generation antipsychotic drugs, these drugs did not cause side effects dealing with the extrapyramidal system in the brain.

1  the payment of kickbacks, in the form of rebates, to LTCF pharmacies and MHA, and to PBMs,

2  based upon the volume of atypical antipsychotics.

3       68.    The LTCFs play an important role in the abuses described herein.  As noted,

4  LTCFs lack sufficient appropriately trained staff to treat residents who suffer from dementia.

5  Accordingly, LTCFs use atypical antipsychotics as chemical restraints to control the behavioral

6  issues prevalent amongst residents of LTCFs.

7       69.    LTCFs also reap significant financial benefits from the pharmacies' submission

8  of claims for atypical antipsychotics to CMS.  Indeed, where a drug is prescribed to a resident

9  of an LTCF and the cost of the drug is not funded by a health insurance payment, i.e., because

10  the cost of the drug is not covered under Medicare Part D, it is the responsibility of the LTCF to

11  absorb that cost.  *See e.g.*, 42 C.F.R. § 483.60 (a) ("A facility must provide pharmaceutical

12  services (including procedures that assure the accurate acquiring, receiving, dispensing, and

13  administering of all drugs and biologicals) to meet the needs of each resident"); *see also*,

14  CMS's "State Operations Manual ("SOM"), Appx. PP – Guidance to Surveyors for Long-Term

15  Care Facilities," at F425[2]  ("A facility must provide pharmaceutical services (including

16  procedures that assure the accurate acquiring, receiving, dispensing and administering of all

17  drugs and biologicals) to meet the needs of each resident . . . The intent of this requirement is

18  that . . . in order to meet the needs of each resident, the facility accurately and safely provides

19  or obtains pharmaceutical services, including the provision of routine and emergency

20  medications and biologicals, and the services of a licensed pharmacist"); *see also*, Department

21  of Health and Human Services, Office of the Inspector General, "Availability of Medicare Part

22  D Drugs to Dual-Eligible Nursing Home Residents," OEI-02-06-00190, June 2008 at p. 10[3]

23  (noting that nursing homes reported paying for drugs that were not paid for by Part D pursuant

24  to the above obligations).  Accordingly, by submitting excluded claims to Medicare, a LTCF

25  pharmacy provides a significant financial benefit to its LTCF client at the substantial expense

26  _____

27  [2]   Available at https://www.cms.gov/manuals/Downloads/som107ap_pp_guidelines_ltcf.pdf; or https://www.cms.gov/transmittals/downloads/R22SOMA.pdf).

28  [3]   Available at http://oig.hhs.gov/oei/reports/oei-02-06-00190.pdf.

1    of Medicare and the Part D Plan Sponsor.

2                    **b.      The Atypical Antipsychotics**

3           70.     The FDA has approved eight atypical antipsychotic drugs to treat various mental

4    disorders, including:

5           a.      Aripiprazole (sold by Bristol-Myers Squibb under the brand name Abilify);

6           b.      Clozapine (sold by Novartis under the brand name Clozaril);

7           c.      Olanzapine (sold by Lilly under the brand name Zyprexa);

8           d.      Olanzapine/Fluoxetine (sold by Lilly under the brand name Symbyax);

9           e.      Paliperidone (sold by Janssen under the brand name Invega);

10          f.      Quetiapine (sold by AstraZeneca under the brand name Seroquel);

11          g.      Risperidone (sold by Johnson & Johnson under the brand name Risperdal); and

12          h.      Ziprasidone (sold by Pfizer under the brand name Geodon).

13          i.      These eight drugs are hereinafter collectively referred to as the "Atypical

14   Antipsychotics."

15          71.     The FDA's approval of these drugs is limited to certain specific mental health

16   conditions, including schizophrenia and certain conditions associated with that illness,

17   schizoaffective disorder, and the acute manic and mixed episodes associated with bipolar

18   disorders.  Risperdal is also approved for use in adolescents for certain symptoms of autism

19   disorder.

20          72.     Significantly, the FDA has declined to approve these drugs as chemical restraints,

21   and such use is strictly prohibited in LTCFs.  *See* 42 C.F.R. § 483.13(a) ("The resident has the

22   right to be free from any physical or chemical restraints imposed for purposes of discipline or

23   convenience, and not required to treat the resident's medical symptoms").

24          73.     Not only is the use of Atypical Antipsychotic drugs as a chemical restraint illegal,

25   it also poses serious health risks.  Such iatrogenic (or treatment caused) conditions include

26   cardiovascular risks such as stroke; parkinsonism; seizures; and diabetes, among others.

27          74.     In addition, each of the Atypical Antipsychotic drugs increases the risk of death

28   in patients with dementia.  In 2003, the FDA issued a public health advisory after concluding

380661                                    17

that the use of Atypical Antipsychotics by patients with dementia posed a 60% to 70% greater risk of death:  *See* FDA's Public Health Advisory, "Deaths With Antipsychotics in Elderly Patients With Behavioral Disturbances," (Apr. 11, 2005).[4]

75.    In 2005, the FDA also imposed a "black box" warning on the prescribing information of all drugs in the atypical antipsychotic class, similar to the following warning for Risperdal (the branded version of Risperidone):

**WARNING: INCREASED MORTALITY IN ELDERLY PATIENTS WITH DEMENTIA-RELATED PSYCHOSIS**
*See* full prescribing information for complete boxed warning.
**Elderly patients with dementia-related psychosis treated with antipsychotic drugs are at an increased risk of death. RISPERDAL® is not approved for use in patients with dementia-related psychosis. (5.1)**

76.    Because of these grave risks to human health and safety, federal law imposes special restrictions on antipsychotic use in treating long-term care facility patients.

77.    For example, Medicare Regulations for LTCFs provide that:

(1) Unnecessary drugs — (1) General.

Each resident's drug regimen must be free from unnecessary drugs.  An unnecessary drug is any drug when used:

    (i)     In excessive dose (including duplicate drug therapy); or

    (ii)    For excessive duration; or

    (iii)   Without adequate monitoring; or

    (iv)    Without adequate indications for its use; or

    (v)     In the presence of adverse consequences which indicate the dose should be reduced or discontinued; or

    (vi)    Any combinations of the reasons above.

    (2)     Antipsychotic Drugs. Based on a comprehensive assessment of a resident, the facility must ensure that —

        (i)     Residents who have not used antipsychotic drugs are not

---

[4]   Available at http://www.fda.gov/Drugs/DrugSafety/-PostmarketDrugSafetyInformationforPatientsand Providers/DrugSafetyInformationforHeathcareProfessionals/PublicHealthAdvisories/ucm053171.htm.

given these drugs unless antipsychotic drug therapy is necessary to treat a specific condition as diagnosed and documented in the clinical record; and

(ii) Residents who use antipsychotic drugs receive gradual dose reductions, and behavioral interventions, unless clinically contraindicated, in an effort to discontinue these drugs.

*See* 42 C.F.R. § 483.25(1).

### 6.   MHA's Role In The Submission Of Claims To Part D For Excluded Atypical Antipsychotics.

78.   Federal Regulations require that each Part D Sponsor have an established drug utilization management and quality assurance programs. See 42 C.F.R. § 423.153(a). A drug utilization management program includes "policies and systems to prevent over-utilization ... of prescribed medications." *See* 42 C.F.R. 423.153(b)(2).

79.   Quality assurance programs include compliance by network pharmacies, like the MHA pharmacies, with State pharmacy practices and concurrent Drug Utilization Review ("DUR"). The purpose of concurrent DUR is to ensure that a review of the prescribed therapy is performed before each prescription is dispensed to a Part D beneficiary. Concurrent DUR must include a review of medication for drug-disease contraindications. *See* 42 C.F.R. § 423.153(c). Each State's Pharmacy Act has subsequently also adopted this DUR requirement.

80.   The Medicare Part D Sponsor's Concurrent DUR must include, at a minimum: (i) screening for potential drug therapy problems due to therapeutic duplication; (ii) age/gender related contraindications; (iii) over-utilization and under-utilization; (iv) drug-drug interactions; (v) incorrect drug dosage or duration of drug therapy. (vi) drug-allergy contraindications; and (vii) clinical abuse/misuse. *See* 42 C.F.R. § 423.153 (c)(2).

81.   CMS has specifically identified the use of claims processing systems as "an effective tool for plans to monitor the delivery of the prescription drug benefit." CMS has identified as examples of claims systems edits used to deny or suspend payments, "edits to prevent payment of statutorily excluded drugs, real time contraindications (i.e., drug-drug interactions) ... sex and age edits compared to the drug prescribed." *See* CMS's Prescription Drug Manual Chapter 9 — Part D Program to Control Fraud, Waste and Abuse, Section

1  50.2.6.3.1, at p. 44. [5]

2      82.    Given the "black box" warnings attendant to the dispensing of Atypical

3  Antipsychotics, a dispensing pharmacist must undertake a concurrent DUR, at the point-of-sale

4  to identify and/or prevent inappropriate drug therapy.

5      83.    This obligation is heightened in the LTCF setting where the patients are

6  particularly vulnerable.  Notably, in the retail setting, dispensing pharmacists are compensated

7  not only based upon the actual cost of the drug, but through a contractually (or sometimes

8  legally) set "dispensing fee."  Because the DUR obligations are heightened in the LTCF

9  pharmacy setting, LTCF pharmacies, like the MHA pharmacies, charge dispensing fees that are

10  at least three times that of a typical retail dispensing fee.

11      84.    Although MHA does not directly dispense drugs to Part D beneficiaries – i.e., its

12  member pharmacies/pharmacists do so -- MHA exercises responsibility for, knowledge of, and

13  control over its member pharmacies/pharmacists' dispensing activities.

14      85.    For instance, in its contract with ProCare (Fox's PBM during part of the time

15  period at issue in this lawsuit), MHA agreed that its own obligations extend to pharmacists

16  performing on MHA's behalf, i.e., the MHA member pharmacies.  Thus, MHA assumed

17  responsibility for those pharmacies' compliance with applicable laws, regulations and rules,

18  including the Part D rules.  The obligations assumed by MHA on behalf of these MHA member

19  pharmacies specifically includes the above described DUR obligations.  *Id.* at § 3.1 (b).

20      86.    MHA has done far more than simply assume responsibility for its member

21  pharmacies' compliance with their obligations under Part D.  Indeed, through its clinical

22  software that it provides to its member pharmacies, MHA exercises control over the entire

23  dispensing processes, including to Part D beneficiaries, that it has subcontracted to those

24  member pharmacies in order to carry out the terms of its contractual and legal obligations to the

25  PBMs, the PDPs and CMS.

26      87.    For instance, MHA provides its member pharmacists and pharmacies with its

27

28  [5]  Available at https://www.cms.gov/PrescriptionDrugCovContra/Downloads/PDBManual_Chapter9_FWA.pdf.

"RxPertise" software. MHA claims this gives them "the ability to determine coverage and locate covered therapeutic alternatives quickly with the Prescription Drug Plan Formulary Checker."

88.    Medicare will only cover drugs that have been approved for coverage under the Sponsor's specific Plan. *See* 42 U.S.C. § 1395w-102(e)(3)(B); *see also*, CMS's Requirements for Submitting Prescription Drug Event Data, (April 26, 2006) at p. 20. [6] The pharmaceuticals that have been approved for coverage under a specific Plan, including patient amounts payable and other restrictions with respect to dispensing, are compiled in what is referred to as the Plan's "formulary." Accordingly, pharmacists are required to not only undertake DURs, but also under Part D Rules, a pharmacist must follow the Plan's "formulary," including any requirements for step-therapies or prior authorizations.

89.    To prevent "inappropriate payment for . . . excluded drugs or indications," CMS has specifically required Plan Sponsors to implement in their formularies certain managed care techniques, including what are referred to as "step-therapy" and "prior authorization." *See*, CMS's Prescription Drug Benefit Manual, Ch. 9, § 70.2.3 rev.2, 04-25-2006. [7]

90.    "Prior authorizations" are requirements in a Part D Plan's prescription drug formulary for a health care provider or beneficiary to contact the Part D Plan Sponsor and obtain approval from the Plan before the pharmacist can dispense certain pharmaceuticals. This requirement is typically imposed for pharmaceuticals that are subject to abuse, or for which alternative and less costly drugs or treatments are available.

91.    To properly perform step-therapy and prior authorizations, the pharmacist must possess and take into account the diagnosis of the individual patient. Accordingly, in order to effectively assist the member pharmacies in carrying out its managed care obligations (as MHA claims it does), the MHA software must take into account the actual diagnosis of the particular beneficiary.

---

[6]    Available at https://www.cms.gov/DrugCoverageClaimsData/Downloads/PDEGuidance.pdf.

[7]    Available at https://www.cms.gov/DrugCoverageClaimsData/Downloads/PDEGuidance.pdf.

92.     As demonstrated below, MHA intentionally and recklessly ignored that diagnosis data and failed to properly require its member pharmacies to utilize diagnosis information when making both clinical determinations and determinations on what entity (Part D or the LTCF) should be billed for the Atypical Antipsychotics.

**C.     MHA Illegally Billed CMS For Drugs That Were Not Covered By Part D**

93.     Not all drugs are eligible for reimbursement under Medicare Part D. Indeed, Medicare will only cover those drugs that are: (a) prescribed for a "medically-accepted indication;" and (b) that have been approved for coverage under the Sponsor's specific Plan. *See* 42 C.F.R. § 423.100; 42 U.S.C. §§ 1395w-102(e)(1), 1395w-102(e)(3)(B); *see also*, CMS's Requirements for Submitting Prescription Drug Event Data, (April 26, 2006) at p. 20. [8]

94.     Medically-accepted indications under Part D include uses approved by the Food and Drug Administration ("FDA"), and only those "off-label" uses that are supported by certain compendia (privately-published books or electronic databases that provide information on prescription drugs to healthcare providers and pharmacists). These compendia include: the American Hospital Formulary Service Drug Information; the United States Pharmacopeia Drug Information or its successor publications; and Thomson's DrugDEX Information System. *See* 42 U.S.C. §§ 1395w-102(e)(4)(A)(ii), 1396r-8(g)(1)(B)(i). These compendia are updated quarterly.

95.     Under Part D, CMS has identified six "protected classes" of pharmaceuticals: immunosuppressants (for prophylaxis of organ transplant rejection), antipsychotics, antidepressants, anticonvulsants, antineoplastics, and antiretroviral drugs.

96.     For Part D beneficiaries "currently taking" any of these drugs, PDP Sponsors are expressly prohibited from employing certain managed care techniques, such as step therapy and alternative treatments.

97.     Although antipsychotics are protected classes of drugs, that designation does not broaden the scope of their coverage under Medicare Part D. Indeed, antipsychotics, like all

---

[8]     Available at https://www.cms.gov/DrugCoverageClaimsData/Downloads/PDEGuidance.pdf.

other drugs, are only reimbursable when used for a medically accepted indication.  *See* 42 U.S.C. § 1395w-102(e)(1); *see also*, 42 C.F.R. § 423.100.

98.     From 2006 to the present, MHA has intentionally and knowingly billed for Atypical Antipsychotic drugs dispensed to Part D beneficiaries who did not suffer from a condition for which the FDA has approved the drugs, or for which the compendia otherwise supported the use of the drugs -- including those to whom Atypical Antipsychotics were dispensed to beneficiaries suffering from conditions such as dementia that are subject to the FDA black box warnings described above.

99.     Dubiously, Zyprexa and Risperidone, two of the eight Atypical Antipsychotics, appeared in the DrugDex compendia for one quarter each in 2008 as having a medically-accepted indication for one specific type of dementia known as Dementia of the Lewy Body Type, or "Lewy Body Dementia."

100.    None of the patients who were dispensed one of those Atypical Antipsychotics by MHA through its member pharmacies presented with a diagnosis of Lewy Body Dementia, nor could they have.  Specifically, dementia of the Lewy Body Type is a form of dementia that can only be diagnosed through an autopsy -- obviously after the death of the patient.  *See* http://www.lbda.org/content/diagnosis (accessed on January 13, 2012).

101.    Moreover, MHA's pharmacists had access to diagnostic information regarding each Part D beneficiary residing in an LTCF.  Yet, MHA nevertheless failed to take any steps whatsoever, such as configuring its computer software or otherwise requiring MHA member pharmacies to determine whether such drugs were dispensed for a medically accepted indication.

102.    At the very least, MHA acted with reckless disregard and deliberate ignorance as to whether an Atypical Antipsychotic was a covered Part D drug (i.e., because the diagnosis presented a medically accepted indication).

103.    Accordingly, MHA caused to be submitted to CMS thousands and thousands of claims where there was no medically accepted indication.  Those claims should have been submitted to the LTCF, making all such claims false.

**D.    MHA Knowingly Caused to Be Submitted Claims For Drugs That Were Dispensed To Part D Beneficiaries As A Result Of Illegal Kickbacks.**

104.    Compliance with the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), is a condition of payment under Medicare, and each claim made in violation of the AKS is a false claim.

105.    The AKS was enacted to protect patients and as well as Federally-sponsored healthcare programs, such as Medicare and Medicaid, from fraud and abuse by curtailing the corrupting influence of money on healthcare decisions.  The primary purpose of the statute is to prevent kick-backs or payoffs to those who can influence healthcare decisions.  The statute attempts to remove potential economic incentives that could influence healthcare providers to refer or recommend medical goods and services that are medically inappropriate, medically unnecessary, of poor quality, or even harmful to a patient population.

106.    A violation of the AKS constitutes a false and fraudulent claim under the Federal FCA.

107.    The AKS prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a Federally-funded healthcare program.  With some exceptions, the statute prohibits kickbacks, bribes, inducements, rewards, and other economic incentives and remuneration that induce physicians to refer patients for services or recommend purchase of medical supplies that will be reimbursable under government-funded healthcare programs, such as Medicare and Medicaid.  Both sides of the kickback relationship are liable under the statute.

108.    In addition, compliance with the AKS in the first instance is a precondition to participation as a healthcare provider under the Medicare, Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, and other federal healthcare programs. Accordingly, all participating healthcare providers must certify that they have complied with the AKS, in addition to other applicable laws, rules and regulations.

109.    As detailed below, MHA violated the AKS in several ways which rendered the

1  resulting claims false.

2      110.   The submission of claims for those drugs also violated the FCA because they
3  were the result of illegal kickbacks.

4          **1.   Rebates Paid To MHA By The Manufacturers Of The Atypical**
5          **Antipsychotic, And Rebates Paid By MHA To Its Member**
6          **Pharmacies, Were Illegal Kickbacks Resulting In The Submission Of**
           **False Claims**

7      111.   MHA was induced into creating the conditions for the improper dispensing of
8  Atypical Antipsychotic drugs, and in turn the illegal submission of those claims to CMS,
9  because of volume-based "rebates" it received directly from drug manufacturers in exchange
10 for dispensing those drugs -- which it shared with its MHA member pharmacies.

11     112.   The Part D program relies on Plan Sponsors to negotiate drug manufacturer
12 rebates and other price concessions to reduce the cost of the program to beneficiaries and the
13 Government.  Price concessions are payments that decrease a Sponsor's drug costs.  *See* 42
14 CFR § 423.308.

15     113.   Sponsors pass rebates, and other types of price concessions, on to beneficiaries
16 and the Government in several ways.  Sponsors must include expected rebates and other price
17 concessions in their bids, which lowers the premiums beneficiaries pay for drug coverage.
18 Sponsors may pass the cost savings derived from rebates directly on to beneficiaries at the time
19 they purchase drugs; these are called point-of-sale rebates.  *See* 70 Fed. Reg. 4195, 4244 (Jan.
20 28, 2005).

21     114.   Additionally, Sponsors pass rebates on to the Government by reporting their
22 actual rebates to CMS, which then uses them to adjust Part D payments in a process called
23 "payment reconciliation."  *See* 42 CFR §§ 423.315 and 423.343.  Specifically, Sponsors must
24 include in their bids all price concessions that are not passed on to the beneficiary at the point
25 of sale.  *See* CMS's  Instructions for Completing the Medicare Prescription Drug Plan Bid
26 Pricing Tool for Contract Year 2008, April 2007, p. 26.

27     115.   Before the beginning of the Plan year, Plan Sponsors must provide CMS with
28 information about all rebates that they expect to receive as a part of their bids.  Specifically,

Sponsors must include in their bids all price concessions that are not passed on to the beneficiary at the point of sale. *See* CMS's Instructions for Completing the Medicare Prescription Drug Plan Bid Pricing Tool for Contract Year 2008, April 2007, p. 26.

116.   These bids provide CMS with an estimate of the cost to provide the benefit to each beneficiary.   CMS uses the bids to calculate beneficiary premiums for each Plan. Sponsors must report any anticipated rebates to CMS in the bids to reduce beneficiary premiums. *See* 42 U.S.C. § 1395w-113.

117.   When Sponsors do not report rebates in their bids, both the Government and beneficiaries overpay for the benefit.   Specifically, during reconciliation, CMS compares the monthly payments it makes to the Sponsor and the premiums charged to beneficiaries to the Sponsor's costs.   To do this, CMS requires Sponsors to provide information about the actual rebates they receive in reports known as "Direct and Indirect Remuneration Reports for Payment Reconciliation," or "DIR," hereinafter referred to as "Rebate Reports." *See, e.g.*, CMS, Final Medicare Part D DIR Reporting Requirements for 2008 Payment Reconciliation, June 8, 2009, p. 1; *see also*, U.S.C. § 1395w-115(f)(1)(A).

118.   Accordingly, the rebate amounts that Sponsors must report reduces the amounts that the Government pays the Sponsors for providing the benefit.

119.   As borne out by the present case, CMS has long recognized that such rebates from drug manufacturers provide dangerous and costly incentives for dispensing unnecessary medications to Medicare beneficiaries. *See, e.g.*, CMS's Medicare Part D Reporting Requirements, Eff. Jan. 1, 2011 at p. 22, § XII. [9]

120.   Accordingly, LTCF pharmacies such as MHA were and are required to disclose such rebates to PDP Sponsors, and they in turn were required to report them to CMS. *See e.g.*, CMS's Weekly Bulletin, May 12, 2006[10]; *see also*, CMS's Medicare Part D Reporting Requirements, eff. Jan. 1, 2011 at p. 21, § XI (CMS requires that Plan Sponsors (and

---

[9]   Available at
https://www.cms.gov/PrescriptionDrugCovContra/Downloads/CY2011PartDReportingRequirements012011.pdf.

[10]   Available at: https://www.cms.gov/PrescriptionDrugCovContra/downloads/WeeklyBulletin_05.12.06.pdf.

*QUI TAM* **COMPLAINT**

accordingly downstream pharmacies) disclose each and every rebate received from a drug manufacturer).

121.    MHA never disclosed to the PDP Sponsors, the PBMs or CMS that it was receiving rebates from the manufacturers of the Atypical Antipsychotics.

122.    Not only was MHA specifically required to disclose that it was receiving any such rebates, it was expressly prohibited from retaining the rebates that it received from drug manufacturers.

123.    For example, in its contract with ProCare, rebates were expressly excluded from MHA's and its member pharmacies' permitted reimbursement as follows:

"Section 6--Reimbursement

...

In all cases, the Pharmacy Provider will receive as reimbursement for drugs dispensed an amount equal to the following:

- the lesser of the following amounts: Pharmacy Provider's Usual and Customary Charge less any mutually agreed discount percentage, the Pharmacy Provider's submitted cost, AWP less the applicable discount percentage calculated on the date of service or fill date, or the agreed MAC price as calculated on the date of service or fill date.

- plus the applicable dispensing fee (not applicable to Pharmacy Provider's Usual and Customary Charge).

- plus any approved submitted federal, state or local tax.

- less the Covered Person's applicable co-payment, co-insurance and/or deductible if any.

- less any contracted or standard processing fee as applicable

124.    Under the AKS:

(A)

(1)    Whoever knowingly and willfully solicits or **receives** any remuneration (including any kickback, bribe, or **rebate**) directly or indirectly, overtly or covertly, in cash or in kind —

(2)    Whoever knowingly and willfully offers or **pays any remuneration** (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person **to induce such person** –

\*\*\*

(B)   in return for purchasing, leasing, ordering, or **arranging for** or recommending **purchasing**, leasing, **or ordering any good**, facility, service, or item **for which payment may be made in whole or in part under a Federal health care program,**

. . . shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

*See* 42 U.S.C. § 1320a-7b (emphasis added).

125.   The undisclosed rebates paid to MHA by the Atypical Antipsychotic manufacturers were "rebates" received by MHA in return for its arranging for the purchasing of Atypical Antipsychotics for which payment was made in whole or in part under Medicare Part D.

126.   Because MHA received "rebates" in return for the volume of excluded Atypical Antipsychotics dispensed by its member pharmacies, all of the resulting claims for payment were false and fraudulent.

127.   Moreover, MHA also violated the AKS by paying rebates to its member pharmacies, which directly incentivized those pharmacies to dispense Atypical Antipsychotics. *See* http://mhainc.com/templates/c3-l2.aspx?id=49&terms=LTC (MHA provides its members with "performance-based reimbursements for formulary management and generic therapy management" or in other words, volume based rebates).

128.   Such payments constituted remuneration or "rebates" that were used to induce the member pharmacies to dispense Atypical Antipsychotics for purposes of the AKS. Accordingly, all claims for payment for such drugs were false and fraudulent.

129.   From January 1, 2006 to the present, MHA knowingly caused to be submitted false claims that were the result of illegal kickbacks paid by the manufacturers of the Atypical Antipsychotics, and as a result of kickbacks paid by MHA to its member pharmacies.

### 2.   The Waiver Of Co-Pays By MHA Was An Illegal Kickback

130.   Another crucial component in preventing Medicare fraud, waste and abuse is the use of beneficiary co-pays.

131.   Copayments are small amounts paid by Part D Plan members for prescription drugs.

132.   Although individual copayment amounts may be small, they are a critical component of cost containment in Medicare Part D because they ensure that Part D beneficiaries have an incentive to monitor claims for drugs made on their behalf and to request less expensive drugs.

133.   The amounts and circumstances under which co-pays are charged are set by Part D Plans' formularies, which are submitted to and approved by CMS prior to each Plan year and communicated to pharmacies.

134.   Copayments called for in a PDP's formulary may be waived under certain very limited circumstances, i.e., typically for patients who receive low-income subsidy payments and "dual-eligibles" (persons receiving benefits under both Medicare Part D and Medicaid).

135.   At all times relevant to this Complaint, Fox's CMS-approved formularies required Part D Plan Members to pay copayments for certain prescription drugs -- including but not limited to the above referenced Atypical Antipsychotics.

136.   From January 1, 2006 to the present MHA failed to collect co-pays required under the relevant formulary involving patients who were not eligible to have their co-pays waived including but not limited to those for whom Atypical Antipsychotics were prescribed.

137.   Under the AKS:

\*\*\*

(2)   whoever knowingly and willfully offers or **pays any remuneration** (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person **to induce such person** –

\*\*\*

(B)   **to purchase**, lease, order, or arrange for or recommend purchasing, leasing, or ordering **any good**, facility, service, **or item for which payment may be made in whole or in part under a Federal health care program,**

. . . shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000, or imprisoned for not more than five years, or both. *See* 42 U.S.C. § 1320a-7b(b) (emphasis added).

138.   Through its own software, MHA caused its member pharmacies to waive copayments as a means of inducing beneficiaries to purchase or receive prescription drugs for which payment was made in whole or in part under Medicare Part D.

139.   MHA's actions violated the AKS, and rendered the resulting claims to Medicare false.

### 3.   The Submission Of Claims To Part D For Off-Label Atypical Antipsychotics Constituted Illegal Kickbacks To The LTCFs.

140.   Not only were rebates the source of illegal kickbacks, but MHA also violated the AKS by offering financial inducements to LTCFs to contract with its member pharmacies. This was in violation of the AKS.

141.   Under the AKS:

\*\*\*

(2) whoever knowingly and willfully offers or **pays any remuneration** (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person **to induce such person** –

\*\*\*

(B) **to purchase**, lease, order, or arrange for or recommend purchasing, leasing, or ordering **any good**, facility, service, **or item for which payment may be made in whole or in part under a Federal health care program,**

. . . shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000, or imprisoned for not more than five years, or both.  *See* 42 U.S.C. § 1320a-7b(b) (emphasis added).

142.   Remuneration under the AKS includes anything of value, including the opportunity to bill for services.  By allowing LTCFs to receive payment for drugs that were not covered, MHA offered remuneration to the LTCFs to induce them to encourage the writing and prescribing of off-label prescriptions for Atypical Antipsychotics.

143.   From January 1, 2006 to the present, in thousands of instances MHA knowingly offered remuneration to LTCFs to induce the dispensing of Atypical Antipsychotics to LTCF residents -- claims for which MHA caused to be submitted to CMS under Part D, a federally funded health care program.

30

*QUI TAM* **COMPLAINT**

144.     Specifically, as stated above, where a drug is prescribed to a resident of an LTCF and the cost of drug is not funded by a health insurance payment, i.e., because the cost of the drug is not covered under Medicare Part D, it is the responsibility of the LTCF to absorb that cost. *See* ¶ 62, *supra*.

145.     Recognizing that LTCFs would not willingly bear the costs of the expensive Atypical Antipsychotics when there were alternative lower cost first generation antipsychotics that would serve a similar purpose, MHA provided financial incentives to the LTCFs to arrange for the administering of Atypical Antipsychotics to their residents.  Specifically, MHA agreed to submit non-covered, off-label claims for Atypical Antipsychotics to CMS, so that LTCF was not responsible for the cost of the non-covered drugs.

146.     In turn, as detailed above, MHA received manufacturer rebates for dispensing Atypical Antipsychotics, a discount it was able to share with the LTCFs as a further inducement to improperly prescribe non-covered use of the drugs.

147.     In sum, MHA knowingly violated material conditions of payment for Medicare claims when it engaged in the above described kickback schemes, including by receiving manufacturer rebates, waiving co-pays, and inducing LTCFs with more opportunities to bill. Its conduct rendered the resulting claims false and fraudulent, in violation of the FCA.

**D.     MHA's Illegal and Fraudulent Activity Caused The Submission Of False And Fraudulent Claims And False Records Material To False Claims**

**1.     Summary of the Part D Process - Adjudicating Prescriptions**

148.     When a downstream entity such as MHA dispenses drugs to a Medicare Part D enrollee, MHA submits a claim electronically to the enrollee's Part D Sponsor (often via a PBM), which is comprised of more than 130 fields of information.  The fields in the claim file submitted by the pharmacy are based upon standardized fields set by the National Council for Prescription Drug Programs ("NCPDP").

149.     Submission of the claim by the pharmacy (including by MHA) to the PDP Sponsor of the PBM typically takes place via real-time data transmissions of the electronic claims in the same or materially similar format.

150.   Where the Part D Plan Sponsor uses a PBM, the PBM reviews the pharmacy's initial data submission to conduct pre-dispensing/point-of-sale reviews of the Part D claim as required by Federal law and Regulations and pursuant to the contract between the Plan Sponsor and the PBM.

151.   If the claim for the prescription is not rejected by the Sponsor or PBM, the pharmacy receives payment authorization and co-pay information.  The pharmacy should then dispense the prescription to the Part D beneficiary in accordance State pharmacy laws.  The beneficiary pays the co-pay to the pharmacy and receives the prescription.

152.   At the time of the initial claim submission, as a condition of payment, the pharmacy transmits to the Plan Sponsor or PBM a claim for payment for that prescription consisting of certain data elements required by CMS that are specified by contract between the pharmacy and the Plan Sponsor or PBM.

153.   As a further condition of payment, MHA must ensure that the information contained in the NCPDP data that is used to create the PDEs is accurate, complete, and truthful and that it has complied with all applicable State and Federal laws, rules, regulations, and contract provisions.   Based on this assurance, the PDP Sponsor certifies the accuracy, completeness, and truthfulness of the data to CMS.

154.   Sections 1860D-15(c)(1)(C) and (d)(2) of the MMA require Sponsors to submit data and information necessary for CMS to carry out payment provisions.  Accordingly, the Part D Sponsor then uses the information provided by the LTCF pharmacy, reformats it, and submits it to CMS as a Prescription Drug Event ("PDE").  The PDE record contains prescription drug cost and payment data that enables CMS to make payments to Plans and otherwise administer the Part D benefit.  Throughout the payment year, each time a Medicare beneficiary has a prescription filled under Part D, the Sponsor receives a claim from the pharmacy and notifies CMS of the event via PDE data, including the cost the Sponsor has incurred.

155.   As described in more detail below, CMS uses all of the PDE information at the end of the payment year when it reconciles its advance payments to the Part D Sponsor with the

1  costs the Sponsor has incurred throughout the year.

2          **2.    CMS Part D Payments Based On PDE Claims Data Submitted To**
3          **CMS**

4          156.    The amount of money expended by CMS for prescription drugs purchased by Part
5  D beneficiaries is materially affected by each and every PDE submitted by or on behalf of a
6  PDP.  In short, the more the "drug-spend" for each beneficiary, the higher the amount paid by
7  the Government either through a direct subsidy to the beneficiary, or through payments to the
8  Plan Sponsor and advances and reconciliations.  Thus, the submission of PDEs for prescriptions
9  that should not have been dispensed in the first instance always materially affects the amount
10 paid by CMS.  Payments for such claims are made by CMS in several ways described below.

11         157.    Sections 1860D-14 and 15 of the MMA provide that CMS pay Plans for Part D
12 benefits through subsidies (direct and indirect) and risk sharing.

13         158.    For private fee-for-service Plans (as defined by § 422.4(a)(3)) that offer qualified
14 prescription drug coverage, CMS determines the amount of reinsurance payments to be made to
15 them as provided under § 423.329(c)(3).  42 C.F.R. § 423.315(g).

16         159.    Throughout the year, CMS makes prospective payments to Part D Sponsors for
17 three subsidies based on the Sponsors' approved bids: (1) the direct subsidy (a monthly
18 capitated payment) designed to cover the Sponsor's cost of providing the benefits; (2) the low-
19 income cost-sharing subsidy (the Federal Government's portion of cost-sharing payment for
20 certain low-income beneficiaries); and (3) the reinsurance subsidy (the Federal Government's
21 share of drug costs for beneficiaries who have reached catastrophic coverage).

22         160.    After CMS reconciles a Plan's low-income subsidy and reinsurance costs, it then
23 determines risk-sharing amounts owed by the Plan to CMS, or by CMS to the Plan arising out
24 of the Plan's direct subsidy bid.  Risk-sharing amounts involve calculations based on whether,
25 and to what degree, a Plan's allowable costs per beneficiary exceeded or fell below a target
26 amount for the Plan by certain threshold percentages (commonly called the "Part D risk
27 corridor").  *See* 42 C.F.R. § 423.336.  This risk corridor calculation is materially affected by the
28 amount the Plan expended to pay claims made by pharmacies during that time period.

161.    A Part D Sponsor may also receive other payments from CMS resulting from year-end reconciliations and adjustments.  Pursuant to 42 C.F.R. § 423.343, after the close of the Plan year, CMS is responsible for reconciling the prospective payments to the Part D Sponsor's actual allowable costs to calculate final payments and risk sharing amounts.  CMS determines the Plan's actual allowable costs by relying upon certain data elements submitted by Sponsors in their PDE records, i.e., CMS relies records for each and every PDE claim that was paid.

162.    CMS specifically relies upon and uses the following PDE cost and payment fields in its year end reconciliation: gross drug cost above out-of pocket threshold, gross drug cost below out-of-pocket threshold, low-income cost-sharing subsidy, and covered D Plan paid amount ("the four PDE data elements").  The Sponsor, or its PBM, calculates the four data elements from the point-of-sale claims data submitted by the pharmacy by using instructions provided by CMS.

163.    CMS pays a direct subsidy (a capitated payment) to the Part D Plan ("PDP") in the form of advance monthly payments equal to the Part D Plan's standardized bid, risk adjusted for health status as provided in § 423.329(b), minus a monthly beneficiary premium as determined in § 423.286.  42 C.F.R. § 423.315(b).  In other words, CMS pays a monthly sum to the Part D Plan Sponsor for each Part D beneficiary enrolled in the Plan.

164.    At the end of the payment year, through retroactive adjustments and reconciliations, CMS also reconciles payment year disbursements with updated enrollment and health status data, actual low-income cost-sharing costs, and actual allowable reinsurance costs as provided in § 423.343.  42 C.F.R. § 423.315(f).  In other words, CMS reconciles payments received by Part D Plans at the end of the year to determine whether additional funds are due to or from the Part D Plan Sponsor.  If CMS underpaid the Sponsor for low-income subsidies or reinsurance costs, CMS makes up the difference.  If CMS overpaid the Sponsor for these costs, it recoups the overpayment from the Part D Sponsor.

165.    Accordingly, CMS uses each and every claim submitted as a PDE to determine not only future payments, but also to reconcile past payments to the PDP Sponsors.  Thus,

1  under Part D, CMS determines capitated payments for each Plan based, at least in part, on the

2  Plan's alleged past expenses.

3      166.    Moreover, under Part D, beneficiaries' coverage varies by their cost of drug usage

4  over the course of a Plan year:

   1. Deductible:  As with most insurance plans, beneficiaries do not receive any benefits under Medicare Part D until their out-of-pocket costs for prescription drugs meets a modest deductible amount (e.g., $310 for 2010).

   2. Initial Coverage:  Once a beneficiary meets his deductible, he receives prescription drug benefits up to an annual cap ($2830 for 2010).

   3. Coverage Gap (the "Doughnut Hole"):  After the beneficiary reaches the cap of the initial coverage, he falls into a coverage "gap" until his total out-of-pocket costs reach a threshold for catastrophic coverage (i.e., $4550 for 2010).

   4. Catastrophic Coverage:  After the beneficiary meets the threshold amount, he is again entitled to prescription drug benefits under a reinsurance scheme pursuant to which CMS pays 80% of drug costs, the Part D Sponsor pays 15%, and the beneficiary pays 5%.

15      167.    Accordingly, in addition to the direct subsidy, through low-income subsidies as

16  described above, CMS makes payments to the Part D Plan for premium and cost sharing

17  subsidies on behalf of certain subsidy-eligible individuals as provided in § 423.780 and §

18  423.782.   These types of premium and cost-sharing subsidies for qualifying low-income

19  individuals are called "Low-Income Cost Sharing Subsidies" ("LICS"), and are documented

20  and reconciled using PDE data submitted to CMS.   *See* CMS's Updated Instructions:

21  Requirements for Submitting Prescription Drug Event Data (PDE), 4.27.2006, page 41, Section

22  10.1. [11]

23      168.    Thus, in addition to a monthly insurance premium paid to the Part D Sponsor by

24  CMS and Part D beneficiaries (this is called a "capitated" rate), CMS may be required to make

25  additional payments to (or collect monies from) a Part D sponsor where:

   1. a beneficiary with a low income is entitled to a subsidy from CMS, causing the Government to pay costs that otherwise the beneficiary

---

[11]   Available at https://www.cms.gov/DrugCoverageClaimsData/Downloads/PDEGuidance.pdf.

*QUI TAM* COMPLAINT

would bear, such as copayments and, within the coverage gap, out-of-pocket prescription costs.

2. a beneficiary is entitled to catastrophic coverage, the government pays 80% of the beneficiary's drug costs through reinsurance paid to the PDP Sponsor. In essence, CMS reimburses the Plan for prescriptions for such beneficiaries on a nearly fee-for-service basis.

169. Because most Part D enrollees who reside in LTCFs do so because they suffer from poor health, the overwhelming majority of such enrollees each year reach the annual catastrophic coverage trigger (for 2011, $4,050.00), after which the Federal Government directly reinsures the Plan on an individual enrollee basis against 80% of further prescription drug costs.

170. Consequently, although many Part D enrollees' drug costs are covered by the capitated (per enrollee) subsidy, the majority of long-term care patients enrolled in Part D have the bulk of their claims directly and individually reimbursed by the Federal Government through individual catastrophic coverage reinsurance, or through low-income cost-sharing payments.

171. For enrollees who have reached the level of catastrophic reinsurance, MHA caused each and every of the previously alleged false or fraudulent costs to be submitted by Fox for reimbursement and MHA and/or its member pharmacies ultimately received payment for them. Accordingly, each and every improper claim for an Atypical Antipsychotic submitted to CMS as a PDE, regardless of whether it was during the deductible term, initial coverage term, doughnut hole, or catastrophic coverage affected the amounts paid by CMS. The more claims dollars spent, the more CMS paid. As detailed below, through data in the possession of the Relator, one can determine the monetary amount of that effect upon the Government for each claim.

172. Not only was it improper and illegal for MHA to dispense through its member pharmacies and bill for the Atypical Antipsychotics to patients without a medically-accepted indication, but as described above MHA's improper acts caused serious harm to Part D beneficiaries -- including the inducement of strokes, Parkinsonism and other terrible side

1  effects that the FDA has warned about -- and has since 2005 specifically identified in the black
2  box warnings.

3      173.   MHA, through its member pharmacies, dispensed the Atypical Antipsychotics
4  knowing (or with reckless disregard for, or deliberate ignorance of the fact) that the natural and
5  reasonably foreseeable result of its dangerous and unnecessary prescribing of Atypical
6  Antipsychotics would be the now-necessary (and profitable) billing for additional drugs that the
7  Part D beneficiaries would now need to treat the harmful side effects caused by the Atypical
8  Antipsychotics.

9      174.   Such medications include those used to treat stroke, Parkinsonism, diabetes and
10  other conditions the Part D beneficiaries would otherwise not have needed.

11      175.   As detailed below, the drugs that were rendered false by MHA's illegal activity
12  are readily identifiable from the data in the possession of the Relator, and the monies expended
13  for such drugs constitute damages attributable to MHA's false claims.

14      176.   The U.S. Treasury is not the only one that has been affected by MHA's false
15  claims.  The Plaintiff States themselves have similarly suffered due to their responsibility to
16  pay for a portion of the Part D coverage given to dual-eligible patients.

17      177.   This is so because the MMA requires States to pay a portion of the costs
18  associated with providing federal Medicare drug coverage to persons eligible for both Medicare
19  and Medicaid. *See* 42 U.S.C. § 1396u-5(c)(1)(A), (B).  If a State fails to make the required
20  payments, commonly referred to as "clawback" payments, the Federal Government will offset
21  that amount, plus interest, against Medicaid payments that it otherwise would have made to the
22  States. *Id.* § 1396u-5(c)(1)(C).

23      178.   To put the clawback in some context:

24  About 8.8 million elderly and persons with disabilities participate in both the
    Medicare and Medicaid programs.  These 'dual eligibles' accounted for only 15
25  percent of Medicaid enrollment, but just over 40 percent of Medicaid
    expenditures for medical service prior to the transfer of prescription drugs to
26  Medicare.  These same individuals account for over 25 percent of Medicare
    spending.  The duals rely on Medicaid to pay Medicare premiums, cost sharing,
27  and to cover critical benefits not covered by Medicare, such as long-term care.
28

1
2
3
4
5
6

Because dual eligibles have significant medical needs and a much higher per capita cost than other Medicaid beneficiaries, they are a major issue for both Medicare and Medicaid and for both state and federal governments. Prescription drug coverage for the duals was transitioned from Medicaid to the Medicare Part D program on January 1, 2006 but States remain required to finance a portion of this coverage through a payment to the federal government, often referred to as the 'Clawback.' States have argued that all health care for the duals should be the responsibility of the federal government.

7   *See* Kaiser Commission on Medicaid and the Uninsured, *Headed for a Crunch: An Update on*
8   *Medicaid Spending, Coverage and Policy Heading into an Economic Downturn--Results from a*
9   *50 State Medicaid Budget Survey for State Fiscal Years 2008 and 2009* (dated September 2008)
10   at p. 13 *(available at* http://www.kff.org/medicaid/upload/7815.pdf).

11           **3.    Examples Of Specific False and/or Fraudulent Claims And Records.**

12        179.  As a Part D Sponsor, Relator possesses data and records not available to the
13   general public that enable it to identify specific false and fraudulent claims/records created by
14   and/or caused to be submitted by MHA.

15        180.  As stated above, when MHA filled a prescription for a Part D beneficiary, it
16   created computer records in a standard NCPDP format containing over 130 fields information
17   related to each claim, including but not limited to: the identity of the beneficiary; whether the
18   beneficiary was a Part D Plan enrollee; the drug dispensed; the date dispensed; the pharmacy
19   from which the drug was dispensed; certain cost details regarding the drug; whether the
20   pharmacy performed prior authorization; and the co-payment collected.

21        181.  Using those NCPDP fields of data, the Plan Sponsor, or (as in this case) the PBM
22   creates a PDE claim file consisting of certain of the NCPDP fields of data provided by the
23   pharmacy. Each PDE claim is then transmitted to CMS and is used by CMS to make payment
24   determinations as described above.

25        182.  Fox, as a Plan Sponsor, possesses all of the NCPDP claims data submitted by
26   MHA to the PBM for Fox Part D beneficiaries from January 2006 through March 2010. Fox
27   also possesses all of the resulting PDE claims data created from the MHA generated NCPDP
28   claims data.

183.   Fox, as a Part D Plan Sponsor, had access to diagnosis information from which it can definitively demonstrate that the Atypical Antipsychotics were not dispensed for a medically accepted indication – information not contained in the NCPDP or PDE data.

184.   More specifically, Medicare Part D beneficiaries with histories of serious illness are more likely than those with healthier backgrounds to incur large prescription drug costs.  To ensure that Part D plans are adequately compensated for insuring such higher-utilization beneficiaries, CMS employs a risk-adjustment model called "RxHCC" (this acronym stands for "prescription hierarchical condition category").

185.   The RxHCC system consists of a series of code numbers corresponding to groups of related conditions.  CMS reviews each Part D beneficiary's Medicare claims for hospital and physician services (under Medicare Parts A and B, respectively) to determine the diagnoses those healthcare providers have made about the beneficiary, and assigns to each beneficiary RxHCC codes that summarize the beneficiary's medical history.  From these codes, Fox can determine the disease state of the beneficiary, including whether that beneficiary suffered from a disease state that was a medically accepted indication for the prescription of Atypical Antipsychotics.

186.   By pairing the RxHCC diagnostic codes with each claim submitted by the pharmacy for the Atypical Antipsychotics, Fox can identify each claim submitted and paid that was not for a medically accepted indication.

187.   Based upon the above described data, attached hereto as Exhibit 1 is a spreadsheet that includes the particular facts and circumstances for a sample of improper, illegal, and false claims for Atypical Antipsychotics submitted by MHA through its member pharmacies to Fox's PBM.  These claims were then in turn submitted to CMS as PDE claims for which MHA received payment.  In each instance, based upon the RxHCC diagnosis data, Fox has demonstrated that the patient lacked a history of mental illness but rather suffered from dementia, a condition for which there is no medically accepted indication (a condition for which the use of antipsychotics is contraindicated).

188.   Fox also possesses: (a) the actual NCPDP claims submitted by MHA through its member pharmacies for each of the claims identified in Exhibit 1; (b) the actual PDE claims that were caused to be submitted to CMS by MHA or its member pharmacies for each of the claims identified in Exhibit 1; and, (c) the CMS reports containing the RxHCC diagnoses and demonstrating that the patients identified in Ex. 1 lacked a history of mental illness but suffered from dementia, a condition for which there is no medically accepted indication (and a condition for which the use of Atypical Antipsychotics is contraindicated), and thus that the claims were not for covered Part D drugs.  Because the size of these excerpts would be hundreds of printed pages, Fox has not attached them as Exhibits to this Complaint.

189.   Attached hereto as Exhibit 2 are examples of claims submitted by MHA through its member pharmacies for the additional drugs to treat side effects of Part D beneficiaries caused by improperly dispensed Atypical Antipsychotics in the first instance.  The submission of such claims was foreseeable and was proximately caused by the MHA pharmacies' improper dispensing of Atypical Antipsychotics that would not have been dispensed had the MHA pharmacies not first improperly dispensed the Atypical Antipsychotic drugs to those patients.

190.   Fox also possesses: (a) the actual NCPDP claims submitted by MHA through its member pharmacies for each of the claims identified in Exhibit 2; (b) the actual PDE claims that were caused to be submitted to CMS by MHA through its member pharmacies for each of the claims identified in Exhibit 2; and, (c) the CMS reports containing the RxHCC diagnoses and demonstrating that the patients identified in Ex. 2 lacked a history of mental illness but suffered from dementia, a condition for which there is no medically accepted indication (and a condition for which the use of Atypical Antipsychotics is contraindicated), and thus that the claims were not for covered Part D drugs.  Again, because the size of those excerpts would be hundreds of printed pages, Fox has not attached them as Exhibits to this Complaint.

191.   Fox possesses the full set of NCPDP, PDE and RxHCC data for all claims submitted to CMS on behalf of Part D. beneficiaries who were enrolled in Fox's Part D Plans between January 1, 2006 and March 2010 from which additional false claims have been and can be further identified.

1    192.    Moreover, as detailed above, MHA received and paid illegal kickbacks in the

2    form of manufacturer rebates.   Attached hereto as Exhibit 3 is a spreadsheet identifying the

3    rebates that MHA received from manufacturers of the Atypical Antipsychotics for dispensing

4    the same.

5                                    **COUNT ONE**

6                            **(FEDERAL FALSE CLAIMS ACT**

7                            **31 U.S.C. § 3729 (a)(1)(A))**

8    193.    Relator restates and realleges the allegations in paragraphs 1 through 195 above

9    as if each were stated herein in their entirety and those allegations are incorporated herein by

10   reference.

11   194.    This is a claim for treble damages and penalties under the Federal False Claims

12   Act, 31 U.S.C. § 3729, *et seq.*, as amended.

13   195.    From January 1, 2006, and continuing to the present, MHA knowingly caused to

14   be presented to an officer or employee of the United States Government false or fraudulent

15   claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

16   196.    Specifically, through the acts and omissions described herein, and from January

17   1, 2006 to the present, MHA knowingly and intentionally caused Medicare Part D Plan

18   Sponsors and their agents, including PBMs, throughout the United States to present materially

19   false and/or fraudulent claims to officers of the United States Government, including without

20   limitation, claims submitted to CMS as PDE claims, inflated bids, and other claims submitted

21   for approval by CMS and for payment by CMS from Federal funds as described above.

22   197.    As a result of MHA's fraudulent actions, Government health care program

23   officials from CMS, their contractors, carriers, intermediaries and agents, paid and approved

24   claims for payment for Atypical Antipsychotics that should not have been paid or approved,

25   and which would not have been paid or approved had the Government known the facts

26   underlying the submission of those claims.

27   198.    The claims that MHA caused to be submitted were "false" and/or "fraudulent"

28   within the meaning of the FCA because they did not comply with material conditions of