1  WALTER J. LACK, ESQ., State Bar No. 57550
   *wlack@elllaw.com*
2  PAUL A. TRAINA, ESQ., State Bar No. 155805
   *ptraina@elllaw.com*
3  JARED W. BEILKE, ESQ., State Bar No. 195698
   *jbeilke@elllaw.com*
4  **ENGSTROM, LIPSCOMB & LACK**
   A Professional Corporation
5  10100 Santa Monica Blvd., 12th Floor
   Los Angeles, California 90067-4113
6  Tel: (310) 552-3800 / Fax: (310) 552-9434
7
8  MICHAEL I. LEONARD (Moving *Pro Hac Vice*)
   *mleonard@leonardlawoffices.com*
9  LEONARD LAW OFFICES
   203 N. LaSalle Street, Suite 1620
10 Chicago, Illinois 60601
   Tel: (312) 380-6559
11
12 Attorneys for Plaintiffs/Relator

13          **UNITED STATES DISTRICT COURT FOR THE**
14          **CENTRAL DISTRICT OF CALIFORNIA**
15

16 UNITED STATES OF AMERICA          )  CASE NO. 2:13-CV-6154-GAF(PJWx)
   *EX REL.*, FOX RX, INC., AS        )
17 RELATOR UNDER THE FEDERAL          )  **FILED UNDER SEAL**
   FALSE CLAIMS ACT;                  )
18                                    )  **FIRST AMENDED *QUI TAM***
   STATE OF CALIFORNIA, *EX REL.*     )  **COMPLAINT FOR DAMAGES AND**
19 FOX RX, INC., AS RELATOR UNDER     )  **CIVIL PENALTIES FOR**
   THE CALIFORNIA FALSE CLAIMS        )  **VIOLATIONS OF:**
20 ACT;                               )
                                      )  **THE FEDERAL FALSE CLAIMS ACT**
21 DISTRICT OF COLUMBIA, *EX REL.*    )  **(31 U.S.C. § 3729 *ET SEQ.*);**
   FOX RX, INC., AS RELATOR UNDER     )
22 THE D.C. FALSE CLAIMS ACT;         )  **THE CALIFORNIA FALSE CLAIMS**
                                      )  **ACT (CAL. GOV. CODE § 12650);**
23 STATE OF FLORIDA, *EX REL.* FOX    )
   RX, INC., AS RELATOR UNDER THE     )  **THE D.C. FALSE CLAIMS ACT (D.C.**
24 FLORIDA FALSE CLAIMS ACT;          )  **CODE § 2-381.02);**
                                      )
25 STATE OF NEW JERSEY, *EX REL.*     )  **THE FLORIDA FALSE CLAIMS ACT**
   FOX RX, INC., AS RELATOR UNDER     )  **(FLA. STAT. ANN § 68.082(2)); THE**
26 THE NEW JERSEY FALSE CLAIMS        )  **NEW JERSEY FALSE CLAIMS ACT**
   ACT;                               )  **(N.J.S.A. 2A:32C-3);**
27                                    )
                                      )
28 _____   )

383886                                  1
              **FIRST AMENDED *QUI TAM* COMPLAINT**

STATE OF NEW YORK, *EX REL.* FOX
RX, INC., AS RELATOR UNDER THE
NEW YORK FALSE CLAIMS ACT;

and

STATE OF TEXAS, *EX REL.* FOX RX,
INC., AS RELATOR UNDER THE
TEXAS MEDICAID FRAUD
PREVENTION ACT,

        Plaintiffs/Relator,

      v.

MANAGED HEALTH CARE
ASSOCIATES, INC.; MHA LTC, INC.;
and DOES 1 through 10,

        Defendants.

**THE NEW YORK FALSE CLAIMS
ACT (N.Y. STATE FIN. LAW § 189);
and**

**THE TEXAS MEDICAID FRAUD
PREVENTION ACT (TEX. HUM. RES.
CODE ANN. § 36.002)**

**JURY TRIAL DEMANDED**

The United States of America, the District of Columbia, and the States of California, Florida, New Jersey, New York, and Texas (collectively, "the States"), by and through *qui tam* Relator, Fox Rx, Inc. ("Fox," "Plaintiff," or "Relator") bring this action under the Federal False Claims Act, 31 U.S.C. § 3729-3733, *et seq.* ("FCA"), and under the States' False Claims Acts as enumerated below, against Defendant, Managed Health Care Associates, Inc., and its wholly owned subsidiary, MHA LTC, Inc. (collectively as "MHA"), to recover all damages, penalties, and other remedies provided for by the FCA and the States' False Claims Acts, and for their Complaint allege and state as follows:

## I.   INTRODUCTION

1.    MHA is one of the largest companies providing pharmacy services to long-term care facilities ("LTCFs"), including to nursing homes.

2.    Specifically, MHA contracts with private insurers who in turn contract with, and are reimbursed by, the Federal Government pursuant to Medicare Part D ("Part D") to provide prescription drugs through MHA's network of independent pharmacies to beneficiaries of those Part D Plans. The Relator in this case, Fox, is one of those private insurers, known as a Medicare Part D Plan Sponsor or "PDP."

3.     As described in detail below, since the commencement of the Part D program in 2006, MHA, putting profit above the well-being of LTCF residents, has intentionally, routinely, systematically, recklessly, and illegally submitted and caused to be submitted to the United States, materially false records and statements relating to its pharmacies' harmful, dangerous and illegal dispensing of atypical antipsychotic drugs to Medicare and Medicaid recipients belonging to the Medicare Part D Plan sponsored by the Relator or to the hundreds of other PDPs throughout the United States and in the Commonwealth of Puerto Rico whose members are residents of LTCFs.

4.     In short, from January 1, 2006 to the present, MHA has employed a fraudulent scheme to improperly and illegally submit claims for atypical antipsychotic drugs that are medically unnecessary and more importantly, harmful.  In so doing, MHA failed to fulfill its obligations at the point of service to oversee the use of antipsychotic pharmaceuticals in the vulnerable elderly population it serves, thus violating applicable Federal statutes, Federal rules and regulations, CMS instructions, State pharmacy laws, and material contractual provisions relating to its dispensing of drugs to Part D beneficiaries.

5.     Moreover, MHA attempted to camouflage its illegal scheme by: failing to disclose to the United States or the PDP's, the astronomical and illegal kickbacks it received in the form of "rebates" from the manufacturers of atypical antipsychotic drugs, and by waiving, or failing to collect, co-payments from beneficiaries. Those co-pays would have raised red-flags regarding MHA's illegal practices.

6.     As a direct and foreseeable result of the Defendants' improper and illegal practices, Federal health insurance programs have been materially impacted and financially damages by Defendants' submission of false and fraudulent Part D claims.

## II.     PARTIES

7.     Relator, Fox Rx, Inc., is a Delaware corporation and the parent corporation of Fox Insurance, Inc. (collectively, "Fox"), also a Delaware corporation.  During the time period from 2006 to 2010, Fox Insurance, Inc. was engaged in the business of sponsoring PDPs.

8.     Fox, through its review and intimate understanding of claim-specific data

**FIRST AMENDED *QUI TAM* COMPLAINT**

submitted to it and its agents, and through its expertise with respect to mental health issues in LTCF and other settings, is the original source of the allegations and transactions alleged in this Complaint.  Indeed, Fox relies upon its own data in support of these allegations.

9.     Plaintiff, the United States of America, acting through the Department of Health and Human Services ("HHS") and its Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare"), and the Grants to States for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* ("Medicaid").

10.     Each of the Plaintiff States participate in the Medicaid program and each of them has also adopted its own State False Claims Acts similar to the FCA.

11.     Defendants Managed Health Care, Inc., and its wholly owned subsidiary MHA LTC, Inc., are privately held New Jersey corporations with their corporate headquarters located in Florham Park, New Jersey.

12.     According to MHA's website, "[w]ith a clear understanding of industry changes with Medicare Part D, our management team created the Long-Term Care (LTC) Pharmacy Network in 2006 to assist long-term care pharmacies and prescription drug plans (PDPs) with managing LTC Medicare Part D claims.  More than a third of all such claims in the US now flow through the MHA network." *See* http://mhainc.com/templates/c3-l2.aspx?id=53&terms=LTC.

13.     MHA further states on its website that:

> More than 1,100 long-term care pharmacies are enrolled in the MHA Long-Term Care Pharmacy Network — a number that continues to grow as new pharmacies are added.
>
> For these members, MHA network contracts provide access to more than 90 percent of benchmarked PDPs and more than 95 percent of Medicare Advantage–Prescription Drug (MA–PD) plans in the country.

**Benefits of membership**

> Members of the MHA Long-Term Care Pharmacy Network benefit from

4

**FIRST AMENDED *QUI TAM* COMPLAINT**

multiple efficiencies: access, administrative, data and reporting, reimbursement, and more.

- Access to the PDPs and MA–PDs to which your patients subscribe.

- Contracted reimbursements at long-term care rates and multi-year terms, with additional performance-based reimbursements for formulary management and generic therapy management.

- Review of the impact of Medicare Part D with your account-dedicated team, including comprehensive formulary management reporting.

- Net-Rx provides operational and technical services exclusively for LTC pharmacies by helping these organizations to lower operational costs, increase profitability and provide industry specific solutions. Net-Rx's portfolio of products includes drug pricing services, claims reconciliation, transaction services, 340B services, pharmacy operations, offsite data back-up, networking and managed security.

- With RxPertise software from MHA, the ability to determine coverage and locate covered therapeutic alternatives quickly with the Prescription Drug Plan Formulary Checker.

*See* http://mhainc.com/templates/c3-l2.aspx?id=49&terms=LTC

### III.   JURISDICTION AND VENUE

14.   Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

15.   This Court can exercise personal jurisdiction over the Defendants, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. §§ 3729 *et seq.*, and complained of herein took place in part in this District and the Defendant regularly transacted business in this District.  For example, MHA contracted with pharmacies located in this District that were used to carry out MHA's scheme.

16.   Jurisdiction in this Court over all related State laws alleged herein is proper under 31 U.S.C. § 3732(b).

17.   Pursuant to 31 U.S.C. § 3730(b)(2), the Plaintiff prepared, and has served with this Complaint upon the Attorney General of the United States, the United States Attorney for the Central District of California, and the Attorneys General of each of the Plaintiff States to this action, a written disclosure of all material evidence and information currently in its possession.  That disclosure is supported by material evidence known to the Relator at the time

of the filing of this action establishing the existence of Defendants' violations of the FCA. Because those disclosures include attorney-client communications and work product, and were submitted to those Federal officials in their capacity as potential co-counsel in the litigation, the Relator understands those disclosures to be confidential and exempt from disclosure under the Freedom of Information Act. 5 U.S.C. § 552; 31 U.S.C. § 3729(c).

18.    The allegations and transactions alleged herein have not been publicly disclosed. Fox is an original source of the allegations and transactions in this lawsuit.  Fox has also voluntarily provided the information to the Government before filing an action under this section.

19.    Pursuant to 31 U.S.C. §3731(b)(1)(2), this FCA Complaint is initiated within the applicable statute of limitations.

## IV.    ALLEGATIONS COMMON TO ALL COUNTS

### A.    The False Claims Act ("FCA")

20.    The FCA, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval a violation of Federal law for which the United States may recover three times the amount of the damages the Government sustains, in addition to a civil monetary penalty of between $5,500 and $11,000 per claim.

21.    The FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim, a violation of Federal law for which the United States may recover three times the amount of the damages the Government sustains, in addition to a civil monetary penalty of between $5,500 and $11,000 per claim.

22.    The FCA defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.  31 U.S.C. §

1    3729(b)(2).

2       23.    The FCA, 31 U.S.C. § 3729(b)(1), provides that "(1) the terms 'knowing' and

3 'knowingly' – (A) mean that a person, with respect to information – (i) has actual knowledge of

4 the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii)

5 acts in reckless disregard of the truth or falsity of the information; and (B) requires no proof of

6 specific intent to defraud."

7       24.    The FCA, 31 U.S.C. § 3729(b)(4), provides that "(4) the term 'material' means

8 having a natural tendency to influence, or be capable of influencing, the payment or receipt of

9 money or property."

10       25.    As described in detail below, MHA violated the FCA through the fraudulent

11 submission of claims to CMS for excluded atypical-antipsychotic drugs to Part D beneficiaries.

12 MHA knowingly caused to be submitted Part D claims for atypical antipsychotics that were not

13 covered by Part D because the use for which they were prescribed was not approved by the

14 FDA or was not a "medically accepted indication" as set forth in at least one of the three

15 statutorily recognized "Compendia."   MHA also knowingly caused to be submitted Part D

16 claims for atypical antipsychotic drugs that were not covered by Part D because they were the

17 result of illegal kickbacks paid to MHA and offered by MHA.

18       26.    Each of the Plaintiff States to this action has adopted a False Claims Act that

19 provides comparable relief to them for the submission of false and fraudulent claims.   These

20 State False Claims Acts include:

21            a.      California: Cal. Government Code § 12650, *et seq.*;

22            b.      Florida: Fla. Stat. § 68.081, *et seq.*;

23            c.      New Jersey: N.J. St. Fin. Law § 187, *et seq.*;

24            d.      New York: N.Y. State Finance Law § 189, *et seq.*;

25            e.      Texas: Tex. Hum. Res. Code § 32.039, *et seq.*, and § 36.001, *et seq.*;

26 **B.**     **Background**

27       **1.**      **The Medicare Part D Program: Prescription Drug Coverage**

28       27.    Medicare is a federally funded and administered health insurance program for

certain groups of persons, primarily the elderly and the disabled. HHS administers the Medicare program through its sub-agency, CMS.

28. Medicare Part D, a voluntary prescription drug benefit program for Medicare enrollees, became effective on January 1, 2006. *See* 42 U.S.C. 1395w-101, *et seq.*

29. Unlike coverage in Medicare Parts A and B, Medicare Part D coverage is not provided within the traditional Medicare program. Instead, Medicare beneficiaries must affirmatively enroll in one of the many hundreds of Part D Plans offered by private companies, known as "Part D Sponsors," who contract with CMS to administer prescription drug plans ("PDPs"). *See* MMA, Sections 1102, 1860D-1 through 1860D-42, and 1871 of the Social Security Act; 42 U.S.C. §§ 1302, 1395w-101 through 1395w-152, and 1395hh.

30. A Medicare Part D Plan Sponsor (hereinafter, "Sponsor," "PDP Sponsor," or "Part D Sponsor") is an entity that is certified as meeting the requirements of Part D and which has contracted with CMS to provide Part D benefits *See* Section 1860D-41, 42 U.S.C. § 1395w-151(a)(13) and (14)(B). The term "Part D Sponsor" also includes employer and union-sponsored Plans that offer qualified Part D prescription coverage. *See* 42 C.F.R. § 423.4.

31. Under Part D, the process begins with the health insurance company submitting a certified application to CMS to participate as a Part D Plan Sponsor to provide prescription drug coverage to qualifying Part D Plans. *See* 42 C.F.R. §§ 423.502, 423.265 and 423.272. That application is a prerequisite for contracting with CMS as a Part D Plan Sponsor. *Id.* at 42 *C.F.R.* §423.504(b).

32. The Part D Plan Sponsor must also expressly agree to comply with the requirements and standards of Part D and all the terms and conditions of payment. *See* Section 1860D-12, 42 U.S.C. § 1395w-112(b)(1).

33. The contract between the Part D Plan Sponsor and CMS must include the elements listed in 42 *C.F.R.* § 423.505(b), including compliance with the reporting requirements as set forth in § 423.514 and the requirements set forth in § 423.329(b) for submitting drug claims and related information to CMS for its use in risk adjustment calculations. The Part D Plan Sponsor must also expressly agree to provide CMS with the

information CMS determines is necessary to carry out the payment provisions.  *See* 42 C.F.R. § 423.505(b)(8) and (9).

34.   A Part D Plan Sponsor, in contracting with CMS, also expressly "agrees to comply with Federal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law [and] the False Claims Act (32 U.S.C. §§ 3729 *et seq.*)."  42 *C.F.R.* 423.505(h)(1).

35.   To qualify for Part D payments from CMS, prior to each Plan year, each approved Part D Plan Sponsor must submit a bid, certified by an actuary, for each Part D Plan it will be offering.  *See* 42 C.F.R. § 423.265.  The bid contains a per member per month ("PMPM") cost estimate to provide Part D benefits to an average Medicare beneficiary in a particular geographic area.  CMS considers both the tiered formulary structure and utilization management program components of the Part D Plan Sponsor's bid.  *See* 42 C.F.R. § 423.272(a)(2).  From those Part D Plan bids, CMS calculates nationwide and regional benchmarks which represent an average per member/per month ("PMPM") cost.  If the Part D Plan Sponsor's bid exceeds the benchmark, the Plan Member/beneficiary must pay the difference.  Once approved, the Part D Plan Sponsor may market its Plans to eligible Medicare Part D beneficiaries, but CMS also sets restrictions on marketing and enrollment.  *See* 42 C.F.R. § 423.50.

36.   During each benefit year, CMS pays the Part D Plan Sponsor estimated payments on a monthly basis.  In turn, the Part D Plan Sponsor provides CMS with documentation of its actual costs. The Part D Plan Sponsor must provide actual cost information to CMS by submitting a Prescription Drug Event ("PDE") record, with drug cost and payment data, for each and every prescription that is filled for its Plan Members/beneficiaries.

37.   Once enrolled, each Part D Plan Member pays a monthly premium to the Part D Plan, as determined under the Part D Regulations.  *See* 42 C.F.R. §§ 423.153 and 423.293.

38.   In the year following each benefit year, CMS reconciles the PDP Sponsor's actual prescription drug costs, as derived from its PDE records, against the Sponsor's prior bid.  If the PDP Sponsor's actual costs exceed its estimated costs, the Sponsor may be able to recoup some

of its losses through a risk-sharing arrangement with CMS.   Conversely, if a Part D Plan Sponsor's estimated costs exceed its actual costs, the Sponsor may have to pay back some of its estimated payments to CMS.

39.     Thus, CMS pays the Part D Sponsor under Medicare Part D.  The Part D Sponsor then pays the Part D Plan pharmacies for the prescriptions they provided to the Plan Members, less their co-payments.

40.     The Part D Sponsor is required to make several crucial and material certifications to CMS regarding its submission of Part D data used for payment, including:

    a.   Certification of Data that Determines Payment: As a condition for receiving a monthly payment . . . the Part D Plan Sponsor agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of all data related to payment.  The data may include specified enrollment information, claims data, bid submission data, and other data that CMS specifies.  *See* 42 C.F.R. § 423.505(k)(1).

    b.   Certification of Enrollment and Payment Information:  The CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that each enrollee for whom the organization is requesting payment is validly enrolled in a program offered by the organization and the information CMS relies on in determining payment is accurate, complete, and truthful and acknowledge that this information will be used for the purposes of obtaining Federal reimbursement.  *See* 42 C.F.R. § 423.505(k)(2).

    c.   Part D Sponsor Certification of Claims Data: The CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that the claims data it submits under § 423.329(b)(3) (or for fallback entities, under § 423.871(f)) are accurate, complete, and truthful and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement.  *See* 42 C.F.R. § 423.505(k)(3).

    d.   Certification of Bid Submission Information. The CEO, CFO, or an individual delegated the authority to sign on behalf of one of

these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that the information in its bid submission and assumptions related to projected reinsurance and low income cost sharing subsidies is accurate, complete, and truthful and fully conforms to the requirements in § 423.265. *See* 42 C.F.R. § 423.505(k)(4).

41.     The Part D Sponsor is required to affirmatively certify the accuracy and completeness of allowable costs for risk corridor and reinsurance information and of data for price comparison that it submits to CMS. *See* 42 C.F.R. § 423.505(k)(5) and (6).

### 2.     First Tier, Downstream, and Related Entities

42.     The Regulations governing Part D benefits define major entities with which a Part D Sponsor may contract. *See* 42 C.F.R. § 423.505(i); *see also*, CMS's Prescription Drug Manual, Chapter 9 - Part D Program to Control Fraud, Waste and Abuse, 40 — Part D Sponsor Accountability and oversight, p. 12.  CMS has described these entities as "pharmacies or other providers, related entities, contractors, subcontractors, first tier and downstream entities."

43.     A "First Tier Entity" is a party with whom the Part D Sponsor has a written contract "acceptable to CMS with a Sponsor or applicant to provide administrative services or health care services for a Medicare eligible individual under Part D," and most typically a Pharmacy Benefits Manager or "PBM." *See* 42 C.F.R. § 423.501; *see also*, CMS's Prescription Drug Manual Chapter 9 - Part D Program to Control Fraud, Waste and Abuse, 40 — Part D Sponsor Accountability and oversight, p. 12.  Pursuant to those types of contracts, PBMs work with Part D Sponsors to develop and implement a prescription drug formulary, and to provide automated processing services for Part D Sponsors to "adjudicate" claims submitted by pharmacies on a real-time basis.

44.     Part D Sponsor also enter into contracts with pharmacies (including LTCF pharmacies, such as MHA), either directly or through a PBM contracted with that Part D Sponsor, to provide prescription drugs to their Plan Members.  Such pharmacies are referred to as "downstream entities" for the purposes of Part D. *See* 42 C.F.R. § 423.501; *see also*, CMS's Prescription Drug Manual Chapter 9 - Part D Program to Control Fraud, Waste and Abuse, 40 — Part D Sponsor Accountability and oversight, p. 12.

45.     By way of illustration, to accomplish the aims of Part D, a common arrangement is for a Part D Sponsor to enter into a contract with a PBM. The PBM then contracts with participating pharmacies, such as MHA, to provide the actual dispensing services. The pharmacies are thus the "Downstream Entities." If the pharmacies then contract with individual pharmacists, those pharmacists would also be Downstream Entities for the purposes of Part D. *See* CMS Prescription Drug Manual Chapter 9 - Part D Program to Control Fraud, Waste and Abuse, 40 — Part D Sponsor Accountability and Oversight, p. 12.

46.     Fox, as have most Part D Plan Sponsors, contracted with PBMs to process its Part D claims for each of the years from 2006 through 2010.

47.     MHA has contracted with the majority of Medicare Part D Sponsors, including Fox (as discussed in more detail below), either directly or through the PDP Sponsors' PBMs to provide LTCF pharmacy services to Part D beneficiaries enrolled in those Part D Plans. Indeed, on its website, MHA claims that it has contracted with more than 90 percent of benchmarked PDPs and more than 95 percent of Medicare Advantage–Prescription Drug (MA–PD) plans in the country. *See* ¶ 13, *supra*)

### 3.     Conditions of Medicare Part D Program Payments

48.     In order to receive Part D funds from CMS, Part D Sponsors, and their authorized agents, employees, and contractors (including PBMs and pharmacies) are required to comply with all applicable federal laws, regulations, as well as with CMS's Instructions. *See* 42 U.S.C. § 1860D-12(b)(1); 42 C.F.R. § 505(i)(4)(iv).

49.     Medicare Part D specifically requires that PDP Sponsors adhere to all Federal laws and regulations, specifically including those designed to prevent fraud, waste, and abuse. *See* 42 C.F.R. § 423.505(h)(1).

50.     In addition, all First-Tier, Downstream, and Related Entities must similarly comply with all of those mandated requirements. As the Federal Regulations specify, "[i]f any of the Part D Plan Sponsor's activities or responsibilities under its contract with CMS is delegated to other parties, the following requirements apply to any related entity, contractor, subcontractor, or pharmacy: . . . [a]ll contracts or written arrangements must specify that the

related entity, contractor, or subcontractor must comply with all applicable Federal laws, regulations, and CMS instructions." *See* 42 C.F.R. § 423.505(i)(4)(iv).

51.     In addition, just as the Part D Sponsor must affirmatively certify the data it submits to Medicare, pharmacy providers must similarly certify to the accuracy and truthfulness of the data on each and every claim. The Federal Regulations provide that:

> If the claims data are generated by a related entity, contractor, or subcontractor of a Part D Plan Sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement.

*See* 42 C.F.R. § 423.505(k)(3). In sum, pharmacies and PBMs contracting with a Part D Plan (or another PBM) stand in the shoes of the Part D Plan with respect to its obligations under Part D.

52.     In addition to requiring that only accurate and truthful data be submitted for covered and payable claims, Medicare also requires Part D compliance with a number of quality assurance and compliance program requirements. Federal Regulations specifically require that Part D Sponsors establish quality assurance measures and systems that require the Sponsor's network providers "to comply with minimum standards for pharmacy practice as established by the States." *See* 42 C.F.R. § 423.153(c)(1). A "network" provider is described as a pharmacy where enrollees may be expected to obtain covered Part D drugs. *See* 42 C.F.R. § 423.128(b)(5) and (6).

53.     Federal regulations also require that, in order to contract with CMS, a Part D Sponsor must agree to comply with all applicable State law requirements. *See* 42 C.F.R. 423.505(b)(15).

54.     The importance of adhering to applicable State laws in the provision of Medicare Part D prescription drug coverage is also made clear by the Federal Regulations that require, as a condition precedent to contract as a Part D Sponsor, "Any entity seeking to contract as a Part D Plan Sponsor must [h]ave administrative and management arrangements satisfactory to CMS, as demonstrated by at least . . . [a] compliance plan that consists of . . . [w]ritten policies,

procedures, and standards of conduct articulating the organization's commitment to comply with all applicable Federal and State standards." *See* 42 C.F.R. 423.504(b)(iv)(A).

55.   In addition, Part D Sponsors "must have established quality assurance measures and systems to reduce medication errors and adverse drug interactions and improve medication use that include a . . . [r]epresentation that network providers are required to comply with minimum standards for pharmacy practice as established by the States." *See* 42 C.F.R. 423.153(c)(1).

56.   Services performed by or delegated by a PDP Sponsor to "First-Tier" entities, such as PBMs and/or "Downstream" entities, such as pharmacies like MHA and its member pharmacies, must meet the standards required of the Part D Sponsor, and any contract between the PDP and the First Tier PBM or Downstream entities, including pharmacies, must reflect those obligations. *Id.* at §§ 423.505(i)(3)(v), 423.505(i)(4)(iv).

57.   MHA has expressly acknowledged all of these obligations in its contracts with PDP Sponsors and/or PBMs who are under contract to administer Part D claims on behalf of the PDP.

### 4.   Overview of the Medicaid Program

58.   The Medicaid Program, as enacted by Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, *et seq.*, is a joint Federal-State program that provides health care benefits for certain groups, primarily indigent and disabled individuals. The federal Medicaid statute establishes the minimum requirements for State Medicaid programs to qualify for Federal funding. *See* 42 U.S.C. § 1396a.

59.   All of the Plaintiff States to the present action have affirmatively elected to participate in the Medicaid program, and all have elected to offer prescription drug coverage to Medicaid beneficiaries.

60.   The Federal portion of each State's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a State's per capita income compared to the national average. *See* 42 U.S.C. § 1396d(b).

61.   The Medicaid statute requires each participating State to implement and

administer a State Plan for medical assistance services which contains certain specified minimum criteria for coverage and payment of claims. *See* 42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A).   These requirements include a comprehensive description of the State Medicaid agency's payment methodology for prescription drugs. *See* 42 C.F.R. § 447.518.

62.   Although the MMA transferred prescription drug coverage for dual eligibles to Part D, States are still obligated to finance a portion of the Part D coverage through "clawback" payments to the federal government. Even though States are no longer responsible for covering dual eligibles and do not have control over the cost of coverage, the MMA's clawback provision requires States to pay the Federal Government a significant portion of the money they save by no longer providing prescription drug coverage to dual eligibles. *See* Robert Pear, "States Protest Contributions to Drug Plan," New York Times, Oct. 18, 2005.

63.   Most States continue to include the clawback payments as part of the State Medicaid budget, but these payments are not matched with federal funds and they are not included in calculations of federal Medicaid spending. The federal government accounts for these payments as Medicare revenue. The Congressional Budget Office estimated that the clawback payments from States to the federal government will total $124 billion between 2006 and 2015. *Id.*

### 5.   Antipsychotic Fraud, Waste and Abuse In The LTCFs

#### a.   Background

64.   Many LTCF residents suffer from illnesses, such as dementia, whose behavioral challenges require well-trained and adequate numbers of LTCF staff.  Because of the difficulty and cost of dealing with such patients, LTCFs are tempted to, and do, misuse prescription drugs to make residents more "compliant," or, in short, they use these drugs as "chemical restraints."

65.   Certain drugs are frequently misused as chemical restraints.  One class of such drugs is collectively known as "atypical antipsychotics."[1]  Atypical antipsychotic drugs are approved by the FDA to treat the psychotic symptoms of mental illness.  However, atypical

---

[1]   The term "atypical" refers to the now-rejected belief that unlike "typical" or first-generation antipsychotic drugs, these drugs did not cause side effects dealing with the extrapyramidal system in the brain.

antipsychotics also have the effect of making patients for whom there is no FDA-approved use more subdued and compliant and thus easier to manage in an LTCF setting.

66.     The use of medications to treat symptoms or conditions for which the medications have not received FDA-approval is known as "off-label" uses.  While it is not per se illegal for a physician to prescribe a medication for an off-label use, it is in fact illegal for drug manufacturers to market and promote drugs for off-label purposes, including, and especially through, the offering of financial incentives to prescribe drugs for off-label uses.  It is also illegal for physicians and pharmacists to receive incentives such as kickbacks and rebates to prescribe and dispense drugs for off-label purposes.

67.     Drug manufacturers use "off-label" marketing of atypical antipsychotics to cause the illegal prescribing patterns described herein.  These off-label marketing schemes involve the payment of kickbacks, in the form of rebates, to LTCF pharmacies and MHA, and to PBMs, based upon the volume of atypical antipsychotics.

68.     The LTCFs play an important role in the abuses described herein.  As noted, LTCFs lack sufficient appropriately trained staff to treat residents who suffer from dementia. Accordingly, LTCFs use atypical antipsychotics as chemical restraints to control the behavioral issues prevalent amongst residents of LTCFs.

69.     LTCFs also reap significant financial benefits from the pharmacies' submission of claims for atypical antipsychotics to CMS.  Indeed, where a drug is prescribed to a resident of an LTCF and the cost of the drug is not funded by a health insurance payment, i.e., because the cost of the drug is not covered under Medicare Part D, it is the responsibility of the LTCF to absorb that cost.  *See e.g.*, 42 C.F.R. § 483.60 (a) ("A facility must provide pharmaceutical services (including procedures that assure the accurate acquiring, receiving, dispensing, and administering of all drugs and biologicals) to meet the needs of each resident"); *see also*, CMS's "State Operations Manual ("SOM"), Appx. PP – Guidance to Surveyors for Long-Term Care Facilities," at F425[2]   ("A facility must provide pharmaceutical services (including

---

[2]     Available at https://www.cms.gov/manuals/Downloads/som107ap_pp_guidelines_ltcf.pdf; or https://www.cms.gov/transmittals/downloads/R22SOMA.pdf).

procedures that assure the accurate acquiring, receiving, dispensing and administering of all drugs and biologicals) to meet the needs of each resident . . . The intent of this requirement is that . . . in order to meet the needs of each resident, the facility accurately and safely provides or obtains pharmaceutical services, including the provision of routine and emergency medications and biologicals, and the services of a licensed pharmacist"); *see also*, Department of Health and Human Services, Office of the Inspector General, "Availability of Medicare Part D Drugs to Dual-Eligible Nursing Home Residents," OEI-02-06-00190, June 2008 at p. 10[3] (noting that nursing homes reported paying for drugs that were not paid for by Part D pursuant to the above obligations).  Accordingly, by submitting excluded claims to Medicare, a LTCF pharmacy provides a significant financial benefit to its LTCF client at the substantial expense of Medicare and the Part D Plan Sponsor.

### b.    The Atypical Antipsychotics

70.    The FDA has approved eight atypical antipsychotic drugs to treat various mental disorders, including:

    a.    Aripiprazole (sold by Bristol-Myers Squibb under the brand name Abilify);

    b.    Clozapine (sold by Novartis under the brand name Clozaril);

    c.    Olanzapine (sold by Lilly under the brand name Zyprexa);

    d.    Olanzapine/Fluoxetine (sold by Lilly under the brand name Symbyax);

    e.    Paliperidone (sold by Janssen under the brand name Invega);

    f.    Quetiapine (sold by AstraZeneca under the brand name Seroquel);

    g.    Risperidone (sold by Johnson & Johnson under the brand name Risperdal); and

    h.    Ziprasidone (sold by Pfizer under the brand name Geodon).

    i.    These eight drugs are hereinafter collectively referred to as the "Atypical Antipsychotics."

71.    The FDA's approval of these drugs is limited to certain specific mental health conditions, including schizophrenia and certain conditions associated with that illness,

---

[3]    Available at http://oig.hhs.gov/oei/reports/oei-02-06-00190.pdf.

schizoaffective disorder, and the acute manic and mixed episodes associated with bipolar disorders.  Risperdal is also approved for use in adolescents for certain symptoms of autism disorder.

72.   Significantly, the FDA has declined to approve these drugs as chemical restraints, and such use is strictly prohibited in LTCFs.  *See* 42 C.F.R. § 483.13(a) ("The resident has the right to be free from any physical or chemical restraints imposed for purposes of discipline or convenience, and not required to treat the resident's medical symptoms").

73.   Not only is the use of Atypical Antipsychotic drugs as a chemical restraint illegal, it also poses serious health risks.  Such iatrogenic (or treatment caused) conditions include cardiovascular risks such as stroke; parkinsonism; seizures; and diabetes, among others.

74.   In addition, each of the Atypical Antipsychotic drugs increases the risk of death in patients with dementia.  In 2003, the FDA issued a public health advisory after concluding that the use of Atypical Antipsychotics by patients with dementia posed a 60% to 70% greater risk of death:  *See* FDA's Public Health Advisory, "Deaths With Antipsychotics in Elderly Patients With Behavioral Disturbances," (Apr. 11, 2005). [4]

75.   In 2005, the FDA also imposed a "black box" warning on the prescribing information of all drugs in the atypical antipsychotic class, similar to the following warning for Risperdal (the branded version of Risperidone):

> **WARNING: INCREASED MORTALITY IN ELDERLY PATIENTS WITH DEMENTIA-RELATED PSYCHOSIS**
> *See* full prescribing information for complete boxed warning.
> **Elderly patients with dementia-related psychosis treated with antipsychotic drugs are at an increased risk of death. RISPERDAL® is not approved for use in patients with dementia-related psychosis. (5.1)**

76.   Because of these grave risks to human health and safety, federal law imposes special restrictions on antipsychotic use in treating long-term care facility patients.

77.   For example, Medicare Regulations for LTCFs provide that:

> (1) Unnecessary drugs — (1) General.

---

[4]   Available at http://www.fda.gov/Drugs/DrugSafety/-PostmarketDrugSafetyInformationforPatientsand Providers/DrugSafetyInformationforHeathcareProfessionals/PublicHealthAdvisories/ucm053171.htm.

Each resident's drug regimen must be free from unnecessary drugs.   An unnecessary drug is any drug when used:

> (i)    In excessive dose (including duplicate drug therapy); or
>
> (ii)   For excessive duration; or
>
> (iii)  Without adequate monitoring; or
>
> (iv)   Without adequate indications for its use; or
>
> (v)    In the presence of adverse consequences which indicate the dose should be reduced or discontinued; or
>
> (vi)   Any combinations of the reasons above.

(2)    Antipsychotic Drugs. Based on a comprehensive assessment of a resident, the facility must ensure that —

> (i)    Residents who have not used antipsychotic drugs are not given these drugs unless antipsychotic drug therapy is necessary to treat a specific condition as diagnosed and documented in the clinical record; and
>
> (ii)   Residents who use antipsychotic drugs receive gradual dose reductions, and behavioral interventions, unless clinically contraindicated, in an effort to discontinue these drugs.

*See* 42 C.F.R. § 483.25(1).

### 6.    MHA's Role In The Submission Of Claims To Part D For Excluded Atypical Antipsychotics.

78.    Federal Regulations require that each Part D Sponsor have an established drug utilization management and quality assurance programs.   See 42 C.F.R. § 423.153(a).   A drug utilization management program includes "policies and systems to prevent over-utilization ... of prescribed medications." *See* 42 C.F.R. 423.153(b)(2).

79.    Quality assurance programs include compliance by network pharmacies, like the MHA pharmacies, with State pharmacy practices and concurrent Drug Utilization Review ("DUR").   The purpose of concurrent DUR is to ensure that a review of the prescribed therapy is performed before each prescription is dispensed to a Part D beneficiary.   Concurrent DUR must include a review of medication for drug-disease contraindications.   *See* 42 C.F.R. §

**FIRST AMENDED *QUI TAM* COMPLAINT**

1   423.153(c).  Each State's Pharmacy Act has subsequently also adopted this DUR requirement.

2        80.   The Medicare Part D Sponsor's Concurrent DUR must include, at a minimum: (i)

3   screening for potential drug therapy problems due to therapeutic duplication; (ii) age/gender

4   related contraindications; (iii) over-utilization and under-utilization; (iv) drug-drug interactions;

5   (v) incorrect drug dosage or duration of drug therapy. (vi) drug-allergy contraindications; and

6   (vii) clinical abuse/misuse.  *See* 42 C.F.R. § 423.153 (c)(2).

7        81.   CMS has specifically identified the use of claims processing systems as "an

8   effective tool for plans to monitor the delivery of the prescription drug benefit."   CMS has

9   identified as examples of claims systems edits used to deny or suspend payments, "edits to

10   prevent payment of statutorily excluded drugs, real time contraindications (i.e., drug-drug

11   interactions) ... sex and age edits compared to the drug prescribed."  *See* CMS's Prescription

12   Drug Manual Chapter 9 — Part D Program to Control Fraud, Waste and Abuse, Section

13   50.2.6.3.1, at p. 44. [5]

14        82.   Given the "black box" warnings attendant to the dispensing of Atypical

15   Antipsychotics, a dispensing pharmacist must undertake a concurrent DUR, at the point-of-sale

16   to identify and/or prevent inappropriate drug therapy.

17        83.   This obligation is heightened in the LTCF setting where the patients are

18   particularly vulnerable.  Notably, in the retail setting, dispensing pharmacists are compensated

19   not only based upon the actual cost of the drug, but through a contractually (or sometimes

20   legally) set "dispensing fee."   Because the DUR obligations are heightened in the LTCF

21   pharmacy setting, LTCF pharmacies, like the MHA pharmacies, charge dispensing fees that are

22   at least three times that of a typical retail dispensing fee.

23        84.   Although MHA does not directly dispense drugs to Part D beneficiaries – i.e., its

24   member pharmacies/pharmacists do so -- MHA exercises responsibility for, knowledge of, and

25   control over its member pharmacies/pharmacists' dispensing activities.

26        85.   For instance, in its contract with ProCare (Fox's PBM during part of the time

27

28   [5]   Available at https://www.cms.gov/PrescriptionDrugCovContra/Downloads/PDBManual_Chapter9_FWA.pdf.

period at issue in this lawsuit), MHA agreed that its own obligations extend to pharmacists performing on MHA's behalf, i.e., the MHA member pharmacies.   Thus, MHA assumed responsibility for those pharmacies' compliance with applicable laws, regulations and rules, including the Part D rules.  The obligations assumed by MHA on behalf of these MHA member pharmacies specifically includes the above described DUR obligations.  *Id.* at § 3.1 (b).

86.    MHA has done far more than simply assume responsibility for its member pharmacies' compliance with their obligations under Part D.   Indeed, through its clinical software that it provides to its member pharmacies, MHA exercises control over the entire dispensing processes, including to Part D beneficiaries, that it has subcontracted to those member pharmacies in order to carry out the terms of its contractual and legal obligations to the PBMs, the PDPs and CMS.

87.    For instance, MHA provides its member pharmacists and pharmacies with its "RxPertise" software.  MHA claims this gives them "the ability to determine coverage and locate covered therapeutic alternatives quickly with the Prescription Drug Plan Formulary Checker."

88.    Medicare will only cover drugs that have been approved for coverage under the Sponsor's specific Plan.  *See* 42 U.S.C. § 1395w-102(e)(3)(B); *see also*, CMS's Requirements for Submitting Prescription Drug Event Data, (April 26, 2006) at p. 20. [6]  The pharmaceuticals that have been approved for coverage under a specific Plan, including patient amounts payable and other restrictions with respect to dispensing, are compiled in what is referred to as the Plan's "formulary."  Accordingly, pharmacists are required to not only undertake DURs, but also under Part D Rules, a pharmacist must follow the Plan's "formulary," including any requirements for step-therapies or prior authorizations.

89.    To prevent "inappropriate payment for . . . excluded drugs or indications," CMS has specifically required Plan Sponsors to implement in their formularies certain managed care techniques, including what are referred to as "step-therapy" and "prior authorization."  *See*,

---

[6]   Available at https://www.cms.gov/DrugCoverageClaimsData/Downloads/PDEGuidance.pdf.

1  CMS's Prescription Drug Benefit Manual, Ch. 9, § 70.2.3 rev.2, 04-25-2006. [7]

2      90.    "Prior authorizations" are requirements in a Part D Plan's prescription drug

3  formulary for a health care provider or beneficiary to contact the Part D Plan Sponsor and

4  obtain approval from the Plan before the pharmacist can dispense certain pharmaceuticals.  This

5  requirement is typically imposed for pharmaceuticals that are subject to abuse, or for which

6  alternative and less costly drugs or treatments are available.

7      91.    To properly perform step-therapy and prior authorizations, the pharmacist must

8  possess and take into account the diagnosis of the individual patient.  Accordingly, in order to

9  effectively assist the member pharmacies in carrying out its managed care obligations (as MHA

10 claims it does), the MHA software must take into account the actual diagnosis of the particular

11 beneficiary.

12     92.    As demonstrated below, MHA intentionally and recklessly ignored that diagnosis

13 data and failed to properly require its member pharmacies to utilize diagnosis information when

14 making both clinical determinations and determinations on what entity (Part D or the LTCF)

15 should be billed for the Atypical Antipsychotics.

16     **C.    MHA Illegally Billed CMS For Drugs That Were Not Covered By Part D**

17     93.    Not all drugs are eligible for reimbursement under Medicare Part D.  Indeed,

18 Medicare will only cover those drugs that are: (a) prescribed for a "medically-accepted

19 indication;" and (b) that have been approved for coverage under the Sponsor's specific Plan.

20 *See* 42 C.F.R. § 423.100; 42 U.S.C. §§ 1395w-102(e)(1), 1395w-102(e)(3)(B); *see also*, CMS's

21 Requirements for Submitting Prescription Drug Event Data, (April 26, 2006) at p. 20. [8]

22     94.    Medically-accepted indications under Part D include uses approved by the Food

23 and Drug Administration ("FDA"), and only those "off-label" uses that are supported by certain

24 compendia (privately-published books or electronic databases that provide information on

25 prescription drugs to healthcare providers and pharmacists).  These compendia include: the

26 American Hospital Formulary Service Drug Information; the United States Pharmacopeia Drug

27  _____

[7]   Available at https://www.cms.gov/DrugCoverageClaimsData/Downloads/PDEGuidance.pdf.

28 [8]   Available at https://www.cms.gov/DrugCoverageClaimsData/Downloads/PDEGuidance.pdf.

1  Information or its successor publications; and Thomson's DrugDEX Information System.  *See*

2  42 U.S.C. §§ 1395w-102(e)(4)(A)(ii), 1396r-8(g)(1)(B)(i).   These compendia are updated

3  quarterly.

    95.   Under Part D, CMS has identified six "protected classes" of pharmaceuticals: immunosuppressants (for prophylaxis of organ transplant rejection), antipsychotics, antidepressants, anticonvulsants, antineoplastics, and antiretroviral drugs.

    96.   For Part D beneficiaries "currently taking" any of these drugs, PDP Sponsors are expressly prohibited from employing certain managed care techniques, such as step therapy and alternative treatments.

    97.   Although antipsychotics are protected classes of drugs, that designation does not broaden the scope of their coverage under Medicare Part D.   Indeed, antipsychotics, like all other drugs, are only reimbursable when used for a medically accepted indication.  *See* 42 U.S.C. § 1395w-102(e)(1); *see also*, 42 C.F.R. § 423.100.

    98.   From 2006 to the present, MHA has intentionally and knowingly billed for Atypical Antipsychotic drugs dispensed to Part D beneficiaries who did not suffer from a condition for which the FDA has approved the drugs, or for which the compendia otherwise supported the use of the drugs -- including those to whom Atypical Antipsychotics were dispensed to beneficiaries suffering from conditions such as dementia that are subject to the FDA black box warnings described above.

    99.   Dubiously, Zyprexa and Risperidone, two of the eight Atypical Antipsychotics, appeared in the DrugDex compendia for one quarter each in 2008 as having a medically-accepted indication for one specific type of dementia known as Dementia of the Lewy Body Type, or "Lewy Body Dementia."

    100.   None of the patients who were dispensed one of those Atypical Antipsychotics by MHA through its member pharmacies presented with a diagnosis of Lewy Body Dementia, nor could they have.   Specifically, dementia of the Lewy Body Type is a form of dementia that can only be diagnosed through an autopsy -- obviously after the death of the patient.  *See* http://www.lbda.org/content/diagnosis (accessed on January 13, 2012).

**FIRST AMENDED *QUI TAM* COMPLAINT**

101.   Moreover, MHA's pharmacists had access to diagnostic information regarding each Part D beneficiary residing in an LTCF.   Yet, MHA nevertheless failed to take any steps whatsoever, such as configuring its computer software or otherwise requiring MHA member pharmacies to determine whether such drugs were dispensed for a medically accepted indication.

102.   At the very least, MHA acted with reckless disregard and deliberate ignorance as to whether an Atypical Antipsychotic was a covered Part D drug (i.e., because the diagnosis presented a medically accepted indication).

103.   Accordingly, MHA caused to be submitted to CMS thousands and thousands of claims where there was no medically accepted indication.   Those claims should have been submitted to the LTCF, making all such claims false.

### D.   MHA Knowingly Caused to Be Submitted Claims For Drugs That Were Dispensed To Part D Beneficiaries As A Result Of Illegal Kickbacks.

104.   Compliance with the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), is a condition of payment under Medicare, and each claim made in violation of the AKS is a false claim.

105.   The AKS was enacted to protect patients and as well as Federally-sponsored healthcare programs, such as Medicare and Medicaid, from fraud and abuse by curtailing the corrupting influence of money on healthcare decisions.   The primary purpose of the statute is to prevent kick-backs or payoffs to those who can influence healthcare decisions.   The statute attempts to remove potential economic incentives that could influence healthcare providers to refer or recommend medical goods and services that are medically inappropriate, medically unnecessary, of poor quality, or even harmful to a patient population.

106.   A violation of the AKS constitutes a false and fraudulent claim under the Federal FCA.

107.   The AKS prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a Federally-funded healthcare program.   With

some exceptions, the statute prohibits kickbacks, bribes, inducements, rewards, and other economic incentives and remuneration that induce physicians to refer patients for services or recommend purchase of medical supplies that will be reimbursable under government-funded healthcare programs, such as Medicare and Medicaid. Both sides of the kickback relationship are liable under the statute.

108.   In addition, compliance with the AKS in the first instance is a precondition to participation as a healthcare provider under the Medicare, Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, and other federal healthcare programs. Accordingly, all participating healthcare providers must certify that they have complied with the AKS, in addition to other applicable laws, rules and regulations.

109.   As detailed below, MHA violated the AKS in several ways which rendered the resulting claims false.

110.   The submission of claims for those drugs also violated the FCA because they were the result of illegal kickbacks.

> **1.   Rebates Paid To MHA By The Manufacturers Of The Atypical Antipsychotic, And Rebates Paid By MHA To Its Member Pharmacies, Were Illegal Kickbacks Resulting In The Submission Of False Claims**

111.   MHA was induced into creating the conditions for the improper dispensing of Atypical Antipsychotic drugs, and in turn the illegal submission of those claims to CMS, because of volume-based "rebates" it received directly from drug manufacturers in exchange for dispensing those drugs -- which it shared with its MHA member pharmacies.

112.   The Part D program relies on Plan Sponsors to negotiate drug manufacturer rebates and other price concessions to reduce the cost of the program to beneficiaries and the Government. Price concessions are payments that decrease a Sponsor's drug costs. *See* 42 CFR § 423.308.

113.   Sponsors pass rebates, and other types of price concessions, on to beneficiaries and the Government in several ways. Sponsors must include expected rebates and other price concessions in their bids, which lowers the premiums beneficiaries pay for drug coverage.

Sponsors may pass the cost savings derived from rebates directly on to beneficiaries at the time they purchase drugs; these are called point-of-sale rebates. *See* 70 Fed. Reg. 4195, 4244 (Jan. 28, 2005).

114.   Additionally, Sponsors pass rebates on to the Government by reporting their actual rebates to CMS, which then uses them to adjust Part D payments in a process called "payment reconciliation." *See* 42 CFR §§ 423.315 and 423.343. Specifically, Sponsors must include in their bids all price concessions that are not passed on to the beneficiary at the point of sale. *See* CMS's Instructions for Completing the Medicare Prescription Drug Plan Bid Pricing Tool for Contract Year 2008, April 2007, p. 26.

115.   Before the beginning of the Plan year, Plan Sponsors must provide CMS with information about all rebates that they expect to receive as a part of their bids. Specifically, Sponsors must include in their bids all price concessions that are not passed on to the beneficiary at the point of sale. *See* CMS's Instructions for Completing the Medicare Prescription Drug Plan Bid Pricing Tool for Contract Year 2008, April 2007, p. 26.

116.   These bids provide CMS with an estimate of the cost to provide the benefit to each beneficiary. CMS uses the bids to calculate beneficiary premiums for each Plan. Sponsors must report any anticipated rebates to CMS in the bids to reduce beneficiary premiums. *See* 42 U.S.C. § 1395w-113.

117.   When Sponsors do not report rebates in their bids, both the Government and beneficiaries overpay for the benefit. Specifically, during reconciliation, CMS compares the monthly payments it makes to the Sponsor and the premiums charged to beneficiaries to the Sponsor's costs. To do this, CMS requires Sponsors to provide information about the actual rebates they receive in reports known as "Direct and Indirect Remuneration Reports for Payment Reconciliation," or "DIR," hereinafter referred to as "Rebate Reports." *See, e.g.*, CMS, Final Medicare Part D DIR Reporting Requirements for 2008 Payment Reconciliation, June 8, 2009, p. 1; *see also*, U.S.C. § 1395w-115(f)(1)(A).

118.   Accordingly, the rebate amounts that Sponsors must report reduces the amounts that the Government pays the Sponsors for providing the benefit.

119.    As borne out by the present case, CMS has long recognized that such rebates from drug manufacturers provide dangerous and costly incentives for dispensing unnecessary medications to Medicare beneficiaries. *See, e.g.*, CMS's Medicare Part D Reporting Requirements, Eff. Jan. 1, 2011 at p. 22, § XII.[9]

120.    Accordingly, LTCF pharmacies such as MHA were and are required to disclose such rebates to PDP Sponsors, and they in turn were required to report them to CMS. *See e.g.*, CMS's Weekly Bulletin, May 12, 2006[10]; *see also*, CMS's Medicare Part D Reporting Requirements, eff. Jan. 1, 2011 at p. 21, § XI (CMS requires that Plan Sponsors (and accordingly downstream pharmacies) disclose each and every rebate received from a drug manufacturer).

121.    MHA never disclosed to the PDP Sponsors, the PBMs or CMS that it was receiving rebates from the manufacturers of the Atypical Antipsychotics.

122.    Not only was MHA specifically required to disclose that it was receiving any such rebates, it was expressly prohibited from retaining the rebates that it received from drug manufacturers.

123.    For example, in its contract with ProCare, rebates were expressly excluded from MHA's and its member pharmacies' permitted reimbursement as follows:

"Section 6--Reimbursement

. . .

In all cases, the Pharmacy Provider will receive as reimbursement for drugs dispensed an amount equal to the following:

- the lesser of the following amounts: Pharmacy Provider's Usual and Customary Charge less any mutually agreed discount percentage, the Pharmacy Provider's submitted cost, AWP less the applicable discount percentage calculated on the date of service or fill date, or the agreed MAC price as calculated on the date of service or fill date.

- plus the applicable dispensing fee (not applicable to Pharmacy Provider's Usual and Customary Charge).

---

[9]    Available at https://www.cms.gov/PrescriptionDrugCovContra/Downloads/CY2011PartDReportingRequirements012011.pdf.

[10]    Available at: https://www.cms.gov/PrescriptionDrugCovContra/downloads/WeeklyBulletin_05.12.06.pdf.

**FIRST AMENDED *QUI TAM* COMPLAINT**

- plus any approved submitted federal, state or local tax.
- less the Covered Person's applicable co-payment, co-insurance and/or deductible if any.
- less any contracted or standard processing fee as applicable

124.  Under the AKS:

(A)

(1)     Whoever knowingly and willfully solicits or **receives** any remuneration (including any kickback, bribe, or **rebate**) directly or indirectly, overtly or covertly, in cash or in kind —

(2)     Whoever knowingly and willfully offers or **pays any remuneration** (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person **to induce such person** –

\*\*\*

(B)     in return for purchasing, leasing, ordering, or **arranging for** or recommending **purchasing**, leasing, **or ordering any good**, facility, service, or item **for which payment may be made in whole or in part under a Federal health care program,**

. . . shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

*See* 42 U.S.C. § 1320a-7b (emphasis added).

125.  The undisclosed rebates paid to MHA by the Atypical Antipsychotic manufacturers were "rebates" received by MHA in return for its arranging for the purchasing of Atypical Antipsychotics for which payment was made in whole or in part under Medicare Part D.

126.  Because MHA received "rebates" in return for the volume of excluded Atypical Antipsychotics dispensed by its member pharmacies, all of the resulting claims for payment were false and fraudulent.

127.  Moreover, MHA also violated the AKS by paying rebates to its member pharmacies, which directly incentivized those pharmacies to dispense Atypical Antipsychotics. *See* http://mhainc.com/templates/c3-l2.aspx?id=49&terms=LTC (MHA provides its members with "performance-based reimbursements for formulary management and generic therapy

1  management" or in other words, volume based rebates).

2    128. Such payments constituted remuneration or "rebates" that were used to induce the

3  member pharmacies to dispense Atypical Antipsychotics for purposes of the AKS.

4  Accordingly, all claims for payment for such drugs were false and fraudulent.

5    129. From January 1, 2006 to the present, MHA knowingly caused to be submitted

6  false claims that were the result of illegal kickbacks paid by the manufacturers of the Atypical

7  Antipsychotics, and as a result of kickbacks paid by MHA to its member pharmacies.

8      **2.**  **The Waiver Of Co-Pays By MHA Was An Illegal Kickback**

9    130. Another crucial component in preventing Medicare fraud, waste and abuse is the

10  use of beneficiary co-pays.

11    131. Copayments are small amounts paid by Part D Plan members for prescription

12  drugs.

13    132. Although individual copayment amounts may be small, they are a critical

14  component of cost containment in Medicare Part D because they ensure that Part D

15  beneficiaries have an incentive to monitor claims for drugs made on their behalf and to request

16  less expensive drugs.

17    133. The amounts and circumstances under which co-pays are charged are set by Part

18  D Plans' formularies, which are submitted to and approved by CMS prior to each Plan year and

19  communicated to pharmacies.

20    134. Copayments called for in a PDP's formulary may be waived under certain very

21  limited circumstances, i.e., typically for patients who receive low-income subsidy payments

22  and "dual-eligibles" (persons receiving benefits under both Medicare Part D and Medicaid).

23    135. At all times relevant to this Complaint, Fox's CMS-approved formularies

24  required Part D Plan Members to pay copayments for certain prescription drugs -- including but

25  not limited to the above referenced Atypical Antipsychotics.

26    136. From January 1, 2006 to the present MHA failed to collect co-pays required

27  under the relevant formulary involving patients who were not eligible to have their co-pays

28  waived including but not limited to those for whom Atypical Antipsychotics were prescribed.

137.   Under the AKS:

\*\*\*

(2)   whoever knowingly and willfully offers or **pays any remuneration** (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person **to induce such person** –

\*\*\*

(B)   **to purchase**, lease, order, or arrange for or recommend purchasing, leasing, or ordering **any good**, facility, service, **or item for which payment may be made in whole or in part under a Federal health care program,**

. . . shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000, or imprisoned for not more than five years, or both.  *See* 42 U.S.C. § 1320a-7b(b) (emphasis added).

138.   Through its own software, MHA caused its member pharmacies to waive copayments as a means of inducing beneficiaries to purchase or receive prescription drugs for which payment was made in whole or in part under Medicare Part D.

139.   MHA's actions violated the AKS, and rendered the resulting claims to Medicare false.

> **3.**   **The Submission Of Claims To Part D For Off-Label Atypical Antipsychotics Constituted Illegal Kickbacks To The LTCFs.**

140.   Not only were rebates the source of illegal kickbacks, but MHA also violated the AKS by offering financial inducements to LTCFs to contract with its member pharmacies. This was in violation of the AKS.

141.   Under the AKS:

\*\*\*

(2)   whoever knowingly and willfully offers or **pays any remuneration** (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person **to induce such person** –

\*\*\*

(B) **to purchase**, lease, order, or arrange for or recommend purchasing, leasing, or ordering **any good**, facility, service, **or item for which payment may be made in whole or in part under a Federal health care program,**

. . . shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000, or imprisoned for not more than five years, or both. *See* 42 U.S.C. § 1320a-7b(b) (emphasis added).

142.   Remuneration under the AKS includes anything of value, including the opportunity to bill for services.  By allowing LTCFs to receive payment for drugs that were not covered, MHA offered remuneration to the LTCFs to induce them to encourage the writing and prescribing of off-label prescriptions for Atypical Antipsychotics.

143.   From January 1, 2006 to the present, in thousands of instances MHA knowingly offered remuneration to LTCFs to induce the dispensing of Atypical Antipsychotics to LTCF residents -- claims for which MHA caused to be submitted to CMS under Part D, a federally funded health care program.

144.   Specifically, as stated above, where a drug is prescribed to a resident of an LTCF and the cost of drug is not funded by a health insurance payment, i.e., because the cost of the drug is not covered under Medicare Part D, it is the responsibility of the LTCF to absorb that cost. *See* ¶ 62, *supra*.

145.   Recognizing that LTCFs would not willingly bear the costs of the expensive Atypical Antipsychotics when there were alternative lower cost first generation antipsychotics that would serve a similar purpose, MHA provided financial incentives to the LTCFs to arrange for the administering of Atypical Antipsychotics to their residents.  Specifically, MHA agreed to submit non-covered, off-label claims for Atypical Antipsychotics to CMS, so that LTCF was not responsible for the cost of the non-covered drugs.

146.   In turn, as detailed above, MHA received manufacturer rebates for dispensing Atypical Antipsychotics, a discount it was able to share with the LTCFs as a further inducement to improperly prescribe non-covered use of the drugs.

147.   In sum, MHA knowingly violated material conditions of payment for Medicare claims when it engaged in the above described kickback schemes, including by receiving manufacturer rebates, waiving co-pays, and inducing LTCFs with more opportunities to bill. Its conduct rendered the resulting claims false and fraudulent, in violation of the FCA.

**D.    MHA's Illegal and Fraudulent Activity Caused The Submission Of False And Fraudulent Claims And False Records Material To False Claims**

**1.    Summary of the Part D Process - Adjudicating Prescriptions**

148.    When a downstream entity such as MHA dispenses drugs to a Medicare Part D enrollee, MHA submits a claim electronically to the enrollee's Part D Sponsor (often via a PBM), which is comprised of more than 130 fields of information.  The fields in the claim file submitted by the pharmacy are based upon standardized fields set by the National Council for Prescription Drug Programs ("NCPDP").

149.    Submission of the claim by the pharmacy (including by MHA) to the PDP Sponsor of the PBM typically takes place via real-time data transmissions of the electronic claims in the same or materially similar format.

150.    Where the Part D Plan Sponsor uses a PBM, the PBM reviews the pharmacy's initial data submission to conduct pre-dispensing/point-of-sale reviews of the Part D claim as required by Federal law and Regulations and pursuant to the contract between the Plan Sponsor and the PBM.

151.    If the claim for the prescription is not rejected by the Sponsor or PBM, the pharmacy receives payment authorization and co-pay information.  The pharmacy should then dispense the prescription to the Part D beneficiary in accordance State pharmacy laws.  The beneficiary pays the co-pay to the pharmacy and receives the prescription.

152.    At the time of the initial claim submission, as a condition of payment, the pharmacy transmits to the Plan Sponsor or PBM a claim for payment for that prescription consisting of certain data elements required by CMS that are specified by contract between the pharmacy and the Plan Sponsor or PBM.

153.    As a further condition of payment, MHA must ensure that the information contained in the NCPDP data that is used to create the PDEs is accurate, complete, and truthful and that it has complied with all applicable State and Federal laws, rules, regulations, and contract provisions.   Based on this assurance, the PDP Sponsor certifies the accuracy, completeness, and truthfulness of the data to CMS.

154.    Sections 1860D-15(c)(1)(C) and (d)(2) of the MMA require Sponsors to submit data and information necessary for CMS to carry out payment provisions.  Accordingly, the Part D Sponsor then uses the information provided by the LTCF pharmacy, reformats it, and submits it to CMS as a Prescription Drug Event ("PDE").   The PDE record contains prescription drug cost and payment data that enables CMS to make payments to Plans and otherwise administer the Part D benefit.  Throughout the payment year, each time a Medicare beneficiary has a prescription filled under Part D, the Sponsor receives a claim from the pharmacy and notifies CMS of the event via PDE data, including the cost the Sponsor has incurred.

155.    As described in more detail below, CMS uses all of the PDE information at the end of the payment year when it reconciles its advance payments to the Part D Sponsor with the costs the Sponsor has incurred throughout the year.

### 2.    CMS Part D Payments Based On PDE Claims Data Submitted To CMS

156.    The amount of money expended by CMS for prescription drugs purchased by Part D beneficiaries is materially affected by each and every PDE submitted by or on behalf of a PDP.  In short, the more the "drug-spend" for each beneficiary, the higher the amount paid by the Government either through a direct subsidy to the beneficiary, or through payments to the Plan Sponsor and advances and reconciliations.  Thus, the submission of PDEs for prescriptions that should not have been dispensed in the first instance always materially affects the amount paid by CMS.  Payments for such claims are made by CMS in several ways described below.

157.    Sections 1860D-14 and 15 of the MMA provide that CMS pay Plans for Part D benefits through subsidies (direct and indirect) and risk sharing.

158.    For private fee-for-service Plans (as defined by § 422.4(a)(3)) that offer qualified prescription drug coverage, CMS determines the amount of reinsurance payments to be made to them as provided under § 423.329(c)(3).  42 C.F.R. § 423.315(g).

159.    Throughout the year, CMS makes prospective payments to Part D Sponsors for three subsidies based on the Sponsors' approved bids: (1) the direct subsidy (a monthly

capitated payment) designed to cover the Sponsor's cost of providing the benefits; (2) the low-income cost-sharing subsidy (the Federal Government's portion of cost-sharing payment for certain low-income beneficiaries); and (3) the reinsurance subsidy (the Federal Government's share of drug costs for beneficiaries who have reached catastrophic coverage).

160.   After CMS reconciles a Plan's low-income subsidy and reinsurance costs, it then determines risk-sharing amounts owed by the Plan to CMS, or by CMS to the Plan arising out of the Plan's direct subsidy bid.  Risk-sharing amounts involve calculations based on whether, and to what degree, a Plan's allowable costs per beneficiary exceeded or fell below a target amount for the Plan by certain threshold percentages (commonly called the "Part D risk corridor").  *See* 42 C.F.R. § 423.336.  This risk corridor calculation is materially affected by the amount the Plan expended to pay claims made by pharmacies during that time period.

161.   A Part D Sponsor may also receive other payments from CMS resulting from year-end reconciliations and adjustments.  Pursuant to 42 C.F.R. § 423.343, after the close of the Plan year, CMS is responsible for reconciling the prospective payments to the Part D Sponsor's actual allowable costs to calculate final payments and risk sharing amounts.  CMS determines the Plan's actual allowable costs by relying upon certain data elements submitted by Sponsors in their PDE records, i.e., CMS relies records for each and every PDE claim that was paid.

162.   CMS specifically relies upon and uses the following PDE cost and payment fields in its year end reconciliation: gross drug cost above out-of pocket threshold, gross drug cost below out-of-pocket threshold, low-income cost-sharing subsidy, and covered D Plan paid amount ("the four PDE data elements").  The Sponsor, or its PBM, calculates the four data elements from the point-of-sale claims data submitted by the pharmacy by using instructions provided by CMS.

163.   CMS pays a direct subsidy (a capitated payment) to the Part D Plan ("PDP") in the form of advance monthly payments equal to the Part D Plan's standardized bid, risk adjusted for health status as provided in § 423.329(b), minus a monthly beneficiary premium as determined in § 423.286.  42 C.F.R. § 423.315(b).  In other words, CMS pays a monthly sum to

1    the Part D Plan Sponsor for each Part D beneficiary enrolled in the Plan.

2    164.    At the end of the payment year, through retroactive adjustments and

3    reconciliations, CMS also reconciles payment year disbursements with updated enrollment and

4    health status data, actual low-income cost-sharing costs, and actual allowable reinsurance costs

5    as provided in § 423.343.  42 C.F.R. § 423.315(f).  In other words, CMS reconciles payments

6    received by Part D Plans at the end of the year to determine whether additional funds are due to

7    or from the Part D Plan Sponsor.  If CMS underpaid the Sponsor for low-income subsidies or

8    reinsurance costs, CMS makes up the difference.  If CMS overpaid the Sponsor for these costs,

9    it recoups the overpayment from the Part D Sponsor.

10    165.    Accordingly, CMS uses each and every claim submitted as a PDE to determine

11    not only future payments, but also to reconcile past payments to the PDP Sponsors.  Thus,

12    under Part D, CMS determines capitated payments for each Plan based, at least in part, on the

13    Plan's alleged past expenses.

14    166.    Moreover, under Part D, beneficiaries' coverage varies by their cost of drug usage

15    over the course of a Plan year:

16          1.    Deductible: As with most insurance plans, beneficiaries do not receive
17               any benefits under Medicare Part D until their out-of-pocket costs for
                 prescription drugs meets a modest deductible amount (e.g., $310 for
18               2010).

19          2.    Initial Coverage: Once a beneficiary meets his deductible, he receives
                 prescription drug benefits up to an annual cap ($2830 for 2010).
20
            3.    Coverage Gap (the "Doughnut Hole"): After the beneficiary reaches
21               the cap of the initial coverage, he falls into a coverage "gap" until his
                 total out-of-pocket costs reach a threshold for catastrophic coverage
22               (i.e., $4550 for 2010).

23          4.    Catastrophic Coverage: After the beneficiary meets the threshold
24               amount, he is again entitled to prescription drug benefits under a
                 reinsurance scheme pursuant to which CMS pays 80% of drug costs,
25               the Part D Sponsor pays 15%, and the beneficiary pays 5%.

26    167.    Accordingly, in addition to the direct subsidy, through low-income subsidies as

27    described above, CMS makes payments to the Part D Plan for premium and cost sharing

28    subsidies on behalf of certain subsidy-eligible individuals as provided in § 423.780 and §

423.782.   These types of premium and cost-sharing subsidies for qualifying low-income individuals are called "Low-Income Cost Sharing Subsidies" ("LICS"), and are documented and reconciled using PDE data submitted to CMS.   *See* CMS's Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE), 4.27.2006, page 41, Section 10.1.[11]

168.   Thus, in addition to a monthly insurance premium paid to the Part D Sponsor by CMS and Part D beneficiaries (this is called a "capitated" rate), CMS may be required to make additional payments to (or collect monies from) a Part D sponsor where:

1.   a beneficiary with a low income is entitled to a subsidy from CMS, causing the Government to pay costs that otherwise the beneficiary would bear, such as copayments and, within the coverage gap, out-of-pocket prescription costs.

2.   a beneficiary is entitled to catastrophic coverage, the government pays 80% of the beneficiary's drug costs through reinsurance paid to the PDP Sponsor.   In essence, CMS reimburses the Plan for prescriptions for such beneficiaries on a nearly fee-for-service basis.

169.   Because most Part D enrollees who reside in LTCFs do so because they suffer from poor health, the overwhelming majority of such enrollees each year reach the annual catastrophic coverage trigger (for 2011, $4,050.00), after which the Federal Government directly reinsures the Plan on an individual enrollee basis against 80% of further prescription drug costs.

170.   Consequently, although many Part D enrollees' drug costs are covered by the capitated (per enrollee) subsidy, the majority of long-term care patients enrolled in Part D have the bulk of their claims directly and individually reimbursed by the Federal Government through individual catastrophic coverage reinsurance, or through low-income cost-sharing payments.

171.   For enrollees who have reached the level of catastrophic reinsurance, MHA caused each and every of the previously alleged false or fraudulent costs to be submitted by Fox for reimbursement and MHA and/or its member pharmacies ultimately received payment for

---

[11]   Available at https://www.cms.gov/DrugCoverageClaimsData/Downloads/PDEGuidance.pdf.

**FIRST AMENDED *QUI TAM* COMPLAINT**

them. Accordingly, each and every improper claim for an Atypical Antipsychotic submitted to CMS as a PDE, regardless of whether it was during the deductible term, initial coverage term, doughnut hole, or catastrophic coverage affected the amounts paid by CMS. The more claims dollars spent, the more CMS paid. As detailed below, through data in the possession of the Relator, one can determine the monetary amount of that effect upon the Government for each claim.

172. Not only was it improper and illegal for MHA to dispense through its member pharmacies and bill for the Atypical Antipsychotics to patients without a medically-accepted indication, but as described above MHA's improper acts caused serious harm to Part D beneficiaries -- including the inducement of strokes, Parkinsonism and other terrible side effects that the FDA has warned about -- and has since 2005 specifically identified in the black box warnings.

173. MHA, through its member pharmacies, dispensed the Atypical Antipsychotics knowing (or with reckless disregard for, or deliberate ignorance of the fact) that the natural and reasonably foreseeable result of its dangerous and unnecessary prescribing of Atypical Antipsychotics would be the now-necessary (and profitable) billing for additional drugs that the Part D beneficiaries would now need to treat the harmful side effects caused by the Atypical Antipsychotics.

174. Such medications include those used to treat stroke, Parkinsonism, diabetes and other conditions the Part D beneficiaries would otherwise not have needed.

175. As detailed below, the drugs that were rendered false by MHA's illegal activity are readily identifiable from the data in the possession of the Relator, and the monies expended for such drugs constitute damages attributable to MHA's false claims.

176. The U.S. Treasury is not the only one that has been affected by MHA's false claims. The Plaintiff States themselves have similarly suffered due to their responsibility to pay for a portion of the Part D coverage given to dual-eligible patients.

177. This is so because the MMA requires States to pay a portion of the costs associated with providing federal Medicare drug coverage to persons eligible for both Medicare

1  and Medicaid. *See* 42 U.S.C. § 1396u-5(c)(1)(A), (B).  If a State fails to make the required

2  payments, commonly referred to as "clawback" payments, the Federal Government will offset

3  that amount, plus interest, against Medicaid payments that it otherwise would have made to the

4  States. *Id.* § 1396u-5(c)(1)(C).

5      178.   To put the clawback in some context:

6      About 8.8 million elderly and persons with disabilities participate in both the
       Medicare and Medicaid programs.  These 'dual eligibles' accounted for only 15
7      percent of Medicaid enrollment, but just over 40 percent of Medicaid
       expenditures for medical service prior to the transfer of prescription drugs to
8      Medicare.  These same individuals account for over 25 percent of Medicare
9      spending.  The duals rely on Medicaid to pay Medicare premiums, cost sharing,
       and to cover critical benefits not covered by Medicare, such as long-term care.
10

11     Because dual eligibles have significant medical needs and a much higher per
12     capita cost than other Medicaid beneficiaries, they are a major issue for both
       Medicare and Medicaid and for both state and federal governments. Prescription
13     drug coverage for the duals was transitioned from Medicaid to the Medicare Part
14     D program on January 1, 2006 but States remain required to finance a portion of
       this coverage through a payment to the federal government, often referred to as
15     the 'Clawback.'  States have argued that all health care for the duals should be
16     the responsibility of the federal government.

17  *See* Kaiser Commission on Medicaid and the Uninsured, *Headed for a Crunch: An Update on*

18  *Medicaid Spending, Coverage and Policy Heading into an Economic Downturn--Results from a*

19  *50 State Medicaid Budget Survey for State Fiscal Years 2008 and 2009* (dated September 2008)

20  at p. 13 *(available at* http://www.kff.org/medicaid/upload/7815.pdf).

21          **3.     Examples Of Specific False and/or Fraudulent Claims And Records.**

22     179.   As a Part D Sponsor, Relator possesses data and records not available to the

23  general public that enable it to identify specific false and fraudulent claims/records created by

24  and/or caused to be submitted by MHA.

25     180.   As stated above, when MHA filled a prescription for a Part D beneficiary, it

26  created computer records in a standard NCPDP format containing over 130 fields information

27  related to each claim, including but not limited to: the identity of the beneficiary; whether the

28  beneficiary was a Part D Plan enrollee; the drug dispensed; the date dispensed; the pharmacy

1    from which the drug was dispensed; certain cost details regarding the drug; whether the

2    pharmacy performed prior authorization; and the co-payment collected.

3        181.   Using those NCPDP fields of data, the Plan Sponsor, or (as in this case) the PBM

4    creates a PDE claim file consisting of certain of the NCPDP fields of data provided by the

5    pharmacy.  Each PDE claim is then transmitted to CMS and is used by CMS to make payment

6    determinations as described above.

7        182.   Fox, as a Plan Sponsor, possesses all of the NCPDP claims data submitted by

8    MHA to the PBM for Fox Part D beneficiaries from January 2006 through March 2010.  Fox

9    also possesses all of the resulting PDE claims data created from the MHA generated NCPDP

10   claims data.

11       183.   Fox, as a Part D Plan Sponsor, had access to diagnosis information from which it

12   can definitively demonstrate that the Atypical Antipsychotics were not dispensed for a

13   medically accepted indication – information not contained in the NCPDP or PDE data.

14       184.   More specifically, Medicare Part D beneficiaries with histories of serious illness

15   are more likely than those with healthier backgrounds to incur large prescription drug costs.  To

16   ensure that Part D plans are adequately compensated for insuring such higher-utilization

17   beneficiaries, CMS employs a risk-adjustment model called "RxHCC" (this acronym stands for

18   "prescription hierarchical condition category").

19       185.   The RxHCC system consists of a series of code numbers corresponding to groups

20   of related conditions.  CMS reviews each Part D beneficiary's Medicare claims for hospital and

21   physician services (under Medicare Parts A and B, respectively) to determine the diagnoses

22   those healthcare providers have made about the beneficiary, and assigns to each beneficiary

23   RxHCC codes that summarize the beneficiary's medical history.  From these codes, Fox can

24   determine the disease state of the beneficiary, including whether that beneficiary suffered from

25   a disease state that was a medically accepted indication for the prescription of Atypical

26   Antipsychotics.

27       186.   By pairing the RxHCC diagnostic codes with each claim submitted by the

28   pharmacy for the Atypical Antipsychotics, Fox can identify each claim submitted and paid that

1   was not for a medically accepted indication.

2        187.  Based upon the above described data, attached hereto as Exhibit 1 is a
3   spreadsheet that includes the particular facts and circumstances for a sample of improper,
4   illegal, and false claims for Atypical Antipsychotics submitted by MHA through its member
5   pharmacies to Fox's PBM.  These claims were then in turn submitted to CMS as PDE claims
6   for which MHA received payment.  In each instance, based upon the RxHCC diagnosis data,
7   Fox has demonstrated that the patient lacked a history of mental illness but rather suffered from
8   dementia, a condition for which there is no medically accepted indication (a condition for
9   which the use of antipsychotics is contraindicated).

10       188.  Fox also possesses: (a) the actual NCPDP claims submitted by MHA through its
11   member pharmacies for each of the claims identified in Exhibit 1; (b) the actual PDE claims
12   that were caused to be submitted to CMS by MHA or its member pharmacies for each of the
13   claims identified in Exhibit 1; and, (c) the CMS reports containing the RxHCC diagnoses and
14   demonstrating that the patients identified in Ex. 1 lacked a history of mental illness but suffered
15   from dementia, a condition for which there is no medically accepted indication (and a condition
16   for which the use of Atypical Antipsychotics is contraindicated), and thus that the claims were
17   not for covered Part D drugs.  Because the size of these excerpts would be hundreds of printed
18   pages, Fox has not attached them as Exhibits to this Complaint.

19       189.  Attached hereto as Exhibit 2 are examples of claims submitted by MHA through
20   its member pharmacies for the additional drugs to treat side effects of Part D beneficiaries
21   caused by improperly dispensed Atypical Antipsychotics in the first instance.  The submission
22   of such claims was foreseeable and was proximately caused by the MHA pharmacies' improper
23   dispensing of Atypical Antipsychotics that would not have been dispensed had the MHA
24   pharmacies not first improperly dispensed the Atypical Antipsychotic drugs to those patients.

25       190.  Fox also possesses: (a) the actual NCPDP claims submitted by MHA through its
26   member pharmacies for each of the claims identified in Exhibit 2; (b) the actual PDE claims
27   that were caused to be submitted to CMS by MHA through its member pharmacies for each of
28   the claims identified in Exhibit 2; and, (c) the CMS reports containing the RxHCC diagnoses

1   and demonstrating that the patients identified in Ex. 2 lacked a history of mental illness but

2   suffered from dementia, a condition for which there is no medically accepted indication (and a

3   condition for which the use of Atypical Antipsychotics is contraindicated), and thus that the

4   claims were not for covered Part D drugs.  Again, because the size of those excerpts would be

5   hundreds of printed pages, Fox has not attached them as Exhibits to this Complaint.

6       191.   Fox possesses the full set of NCPDP, PDE and RxHCC data for all claims

7   submitted to CMS on behalf of Part D. beneficiaries who were enrolled in Fox's Part D Plans

8   between January 1, 2006 and March 2010 from which additional false claims have been and

9   can be further identified.

10      192.   Moreover, as detailed above, MHA received and paid illegal kickbacks in the

11  form of manufacturer rebates.  Attached hereto as Exhibit 3 is a spreadsheet identifying the

12  rebates that MHA received from manufacturers of the Atypical Antipsychotics for dispensing

13  the same.

## COUNT ONE
### (FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729 (a)(1)(A))

17      193.   Relator restates and realleges the allegations in paragraphs 1 through 192 above

18  as if each were stated herein in their entirety and those allegations are incorporated herein by

19  reference.

20      194.   This is a claim for treble damages and penalties under the Federal False Claims

21  Act, 31 U.S.C. § 3729, *et seq.*, as amended.

22      195.   From January 1, 2006, and continuing to the present, MHA knowingly caused to

23  be presented to an officer or employee of the United States Government false or fraudulent

24  claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

25      196.   Specifically, through the acts and omissions described herein, and from January

26  1, 2006 to the present, MHA knowingly and intentionally caused Medicare Part D Plan

27  Sponsors and their agents, including PBMs, throughout the United States to present materially

28  false and/or fraudulent claims to officers of the United States Government, including without

limitation, claims submitted to CMS as PDE claims, inflated bids, and other claims submitted for approval by CMS and for payment by CMS from Federal funds as described above.

197.   As a result of MHA's fraudulent actions, Government health care program officials from CMS, their contractors, carriers, intermediaries and agents, paid and approved claims for payment for Atypical Antipsychotics that should not have been paid or approved, and which would not have been paid or approved had the Government known the facts underlying the submission of those claims.

198.   The claims that MHA caused to be submitted were "false" and/or "fraudulent" within the meaning of the FCA because they did not comply with material conditions of payment established by the Government.

199.   MHA knowingly and intentionally failed to comply with material conditions of payment of the claims in many ways, including, *inter alia*:

(1)   that MHA caused claims to be submitted for non-covered Part D Drugs i.e., Atypical Antipsychotics that were dispensed without a medically accepted indication;

(2)   that MHA caused claims to be submitted for Atypical Antipsychotics that were in violation of the AKS as a result of improper rebates received and paid by MHA that it failed to properly disclose;

4.   that MHA caused claims to be submitted for Atypical Antipsychotics that were in violation of the AKS as a result of improperly waived co-pays by MHA in violation of the AKS;

5.   that MHA caused claims to be submitted for Atypical Antipsychotics that were in violation of the AKS as a result of MHA providing a benefit to the LTCFs by billing to Medicare drugs that should have been the responsibility of the LTCFs in violation of the AKS.

200.   All of the above were individually and collectively material preconditions of payment or approval.

201.   MHA also falsely certified that it had complied with all applicable statutes, laws, rules, regulations, instructions and contract provisions, and that the pharmacy claims and data it submitted was true, accurate and complete.

202.   Such certifications were false and fraudulent because, as detailed above, MHA

did not comply with the material statutes, rules, regulations, instructions, and contract provisions.

203.   Moreover, MHA fraudulently induced Part D Sponsors, and/or their PBMs, including ProCare, to enter into contracts for the provision by MHA through its member pharmacies of drugs to Part D beneficiaries.   Specifically, MHA entered those contracts knowing and intending that it would not comply with the terms of those contracts, including the requirement that it only submit claims for drugs that were covered by Part D, and that it would comply with all other Federal and State laws, rules, regulations, and instructions relating to the provision of services to Part D beneficiaries.

204.   MHA's false and fraudulent acts and omissions described above influence, and/or had a natural tendency to influence, and/or were capable of influencing, the payment or receipt of money or property by the United States.   Federal health care program officials and their contractors, carriers, intermediaries and agents, would not have paid and/or approved the claims for Atypical Antipsychotics had they known that MHA was violating its legal and contractual obligations as described above.

205.   MHA's knowing conduct rendered the resulting claims false, within the meaning of the FCA.

206.   As a result, the United States has suffered significant losses in an amount to be further determined, including but not limited to: payments made by CMS as a result of the claims for drugs that were not covered under Part D and drugs that were necessitated by the improper dispensing of Atypical Antipsychotic as described above, including but not limited to: (1) calculation of periodic Part D reconciliations and future capitation payments CMS paid or would be paying to the Part D Sponsors involved, including Fox; (2) payments made as part of CMS's low income subsidy; (3) payments made by CMS under the Medicare Part D catastrophic coverage reinsurance; (4) the amount of rebates that should have been disclosed and passed through to the Plan Sponsors and CMS; (5) payments of co-payments that should have been collected; (6) all payments made to MHA under the contracts that it fraudulently induced PBMs and Part D Sponsors to enter.

207.     Moreover, each individual pharmacy claim submitted by MHA or its member pharmacies to a Part D Plan Sponsor or PBM which resulted in a the transmission of a PDE record for that drug is subject to a penalty of between $5500 and $11,000 for each such PDE claim resulting from its submission of pharmacy data.

## COUNT TWO
### (FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729 (a)(1)(B))

208.     Relator restates and realleges the allegations in paragraphs 1 through 192 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

209.     This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

210.     MHA knowingly made, used or caused to be made, or used false records and statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

211.     The false records made and used by MHA through its member pharmacies were the pharmacy claims data for the Atypical Antipsychotics that MHA submitted to Part D Sponsors and/or their PBMs through its member pharmacies.

212.     As described above, each pharmacy claim and record submitted to a PBM and/or Part D Sponsor through the NCPDP data was a false record or statement that was material to the submission of a false and/or fraudulent PDE claim.

213.     Each pharmacy claims data entry was "false" and/or "fraudulent" within the meaning of the FCA because it did not comply with a material condition of payment established by the Government.

214.     The material conditions of payment with which MHA knowingly failed to comply, include, *inter alia*:

    (1)    that MHA caused to be submitted to Medicare claims for Atypical Antipsychotics that were for covered Part D Drugs, but without a medically accepted indication;

    (2)    that MHA caused to be submitted to Medicare claims for Atypical Antipsychotics that were in violation of the AKS as a result of improper

rebates received and paid by MHA that it failed to disclose;

(3)  that MHA caused to be submitted to Medicare claims for Atypical Antipsychotics that were in violation of the AKS as a result of improperly waived co-pays by MHA in violation of the AKS;

(4)  that MHA caused to be submitted to Medicare claims for Atypical Antipsychotics that were in violation of the AKS as a result of MHA providing a benefit to the LTCFs by billing to Medicare drugs that should have been the responsibility of the LTCFs, in violation of the AKS;

215.  MHA also falsely certified that it had complied with all material Federal and State statutes and rules, and contract provisions and that the pharmacy claims it submitted were true, accurate and complete.

216.  Such certifications were false and fraudulent because, as detailed above, MHA did not comply with the material statutes, rules, regulations, instructions, and contract provisions.

217.  Moreover, MHA fraudulently induced Part D Sponsors, and/or their PBMs, including ProCare, to enter contracts for the provision by MHA of drugs to Part D beneficiaries.  Specifically, MHA entered those contracts knowing that it would not comply with their terms, including the requirement that it only submit claims for drugs that were covered by Part D -- and that it would comply with all other Federal and State laws, rules, regulations, and instructions related to the provision of services for Part D beneficiaries.

218.  MHA's false and fraudulent records and statements described above were material to the false claims because they were used as a basis for creating the false PDE claims, and thus influenced, and/or had a natural tendency to influence, and/or were capable of influencing, the payment or receipt of money or property by the United States.  Federal health care program officials and their contractors, carriers, intermediaries and agents, would not have paid and/or approved the claims for Atypical Antipsychotics (and other drugs) had they known that MHA was in violation of its legal and contractual obligations as described above.

219.  MHA's schemes resulted in knowingly false records and statements material to false claims being created and submitted.  As a result, the United States has suffered significant monetary losses in an amount to be further determined, including, but not limited to: payments

1   made by CMS as a result of the claims for drugs that were not covered under Part D and drugs

2   that were necessitated by the improper dispensing of Atypical Antipsychotic drugs as described

3   above including, but not limited to: (1) calculation of periodic Part D reconciliations and future

4   capitation payments CMS paid or would be paying to the Part D Sponsors involved, including

5   Fox; (2) payments made as part of CMS's low income subsidy; (3) payments made by CMS

6   under the Medicare Part D catastrophic coverage reinsurance; (4) the amount of rebates that

7   should have been disclosed and passed through to the Plan Sponsors and CMS; (5) payments of

8   co-payments that should have been collected; (6) payments of dispensing fees for prescriptions

9   that were improperly split; (7) all payments made to MHA under the contracts that it

10  fraudulently induced PBMs and Part D Sponsors to enter.

11       220.   Moreover, each individual pharmacy claim submitted by MHA to a Part D Plan

12  Sponsor or PBM which was made, or used, to create a PDE record for that drug subjects MHA

13  to a penalty of between $5,500 and $11,000 for each and every such PDE claim resulting from

14  its submission of pharmacy data.

### COUNT THREE
### (FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729 (a)(3) and 3729(a)(1)C))

17       221.   Relator restates and realleges the allegations in paragraphs 1 through 192 above

18  as if each were stated herein in their entirety and said allegations are incorporated herein by

19  reference.

20       222.   This is a claim for treble damages and penalties under the Federal False Claims

21  Act, 31 U.S.C. § 3729(a)(3) (1986), and, as amended, 31 U.S.C. § 3729(a)(1)(C).

22       223.   As set forth above, MHA conspired with others in a kickback scheme arising out

23  of rebates, thereby causing the submission of false and fraudulent claims to Medicare and

24  Medicaid seeking reimbursement for drugs dispenses in connection with that kickback scheme.

25       224.   Accordingly, MHA conspired to defraud the United States by getting false or

26  fraudulent claims allowed or paid, in violation of 31 U.S.C. § 3729(a)(3) (1986), and, as

27  amended, 31 U.S.C. § 3729(a)(1)(C), and conspired to commit violations of 31 U.S.C. §

28  3729(a)(1)(A) and § 3729(a)(1)(B).

225.   By reason of the false and fraudulent claims, MHA and its co-conspirators conspired to get allowed or paid or by reasons of their conspiracy to violate 31 U.S.C. § 3729(a)(1)(A) and § 3729(a)(1)(B), the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each and every false claim.

## COUNT FOUR
### (FEDERAL FALSE CLAIMS ACT
### U.S.C. § 3729 (a)(1)(G) ("Reverse False Claims"))

226.   Relator restates and realleges the allegations in paragraphs 1 through 192 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

227.   During the Medicare Part D annual reconciliation process overpayments by CMS to Part D Plans or Sponsors, including Fox, must be returned.

228.   As alleged above, MHA dispensed drugs which were not covered by Part D, thus inflating the pharmacy claims data which was used to create PDE submissions to CMS.

229.   CMS uses the PDE data during reconciliation to determine whether and the amount owed by the Part D Plans to CMS, or the amount owed by CMS to the Part D Plans. Accordingly, improperly inflated claims data results in an improper decrease in the amount owed to CMS by a Part D Plan or an improper avoidance altogether of such obligation by the Part D Plan to pay CMS after reconciliation

230.   At the time of their periodic Medicare Part D reconciliations, MHA failed to report their submission of false pharmacy claims which was used to create false PDE data that was submitted to CMS.

231.   As a result of MHA's creation of inaccurate records used for Medicare Part D annual reconciliations, MHA caused to be submitted false claims in order to avoid returning overpayments to CMS.

232.   The Patient Protection and Affordable Care Act ("PPACA"), 42 U.S.C. § 1128J(d), which MHA violated, requires that MHA self-report and return to Medicare overpayments within 60 days of identification of the overpayment.

383886

**FIRST AMENDED *QUI TAM* COMPLAINT**

1    233.    MHA knowingly caused to be made or used false records or false statements, i.e.,

2  the false certifications caused to be made by Part D Plans when the cost reports and other

3  records submitted for Part D reconciliations were submitted to conceal, avoid, or decrease an

4  obligation to payor transmit money or property to the United States, in violation of the Federal

5  False Claims Act, 31 U.S.C. § 3729(a)(I)(G).

6    234.    MHA's schemes resulted in knowingly false records and statements material to

7  false claims. As a result, the United States has suffered significant losses in an amount to be

8  further determined, including, but not limited to: payments made by CMS as a result of the

9  claims for drugs that were not covered under Part D and drugs that were necessitated by the

10  improper dispensing of atypical antipsychotic drugs as described above including, but not

11  limited to: (1) calculation of periodic Part D reconciliations and future capitation payments

12  CMS paid or would be paying to the Part D Sponsors involved, including Fox; (2) payments

13  made as part of CMS's low income subsidy; (3) payments made by CMS under the Medicare

14  Part D catastrophic coverage reinsurance; (4) the amount of rebates that should have been

15  passed disclosed and passed through to the Plan Sponsors and CMS; (5) payments of co-

16  payments that should have been collected; (6) all payments made to MHA under the contracts

17  that it fraudulently induced PBMs and Part D Sponsors to enter.

18    235.    Moreover, each individual pharmacy claim submitted by MHA to a Part D Plan

19  Sponsor or PBM which was made or used to create a PDE record for that drug subject to a

20  penalty of between $5500 and $11,000 for each such PDE claim resulting from its submission

21  of pharmacy data.

**COUNT FIVE**
**(CALIFORNIA FALSE CLAIMS ACT**
**Cal. Government Code § 12650, *et seq.*)**

24    236.    Relator restates and realleges the allegations in paragraphs 1 through 192 above

25  as if each were stated herein in their entirety and said allegations are incorporated herein by

26  reference.

27    237.    This is a claim for treble damages and penalties under the California False Claims

28  Act.

238.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

239.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

240.   The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal practices.

241.   By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

242.   The State of California is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

243.   This Court is requested to accept supplemental jurisdiction of this related State claim as it is predicated upon the exact same facts as the Federal claims, and merely asserts separate damage to the State of California in the operation of its Medicaid program.

**COUNT SIX**
**(D.C. FALSE CLAIMS ACT**
**D.C. Code § 2-381.01, *et seq.*)**

236.   Relator restates and realleges the allegations in paragraphs 1 through 192 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

237.   This is a claim for treble damages and penalties under the D.C. False Claims Act.

238.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia for payment or approval.

239.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce

the District of Columbia to approve and pay such false and fraudulent claims.

240.   The District of Columbia, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal practices.

241.   By reason of Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

242.   The District of Columbia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

243.   This Court is requested to accept supplemental jurisdiction of this related State claim as it is predicated upon the exact same facts as the Federal claims, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

### COUNT SEVEN
### (FLORIDA FALSE CLAIMS ACT
### Fla. Stat. Ann. §68.082(2))

244.   Relator restates and realleges the allegations in paragraphs 1 through 192 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

245.   This is a claim for treble damages and penalties under the Florida False Claims Act.

246.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

247.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

251.   The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and

**FIRST AMENDED *QUI TAM* COMPLAINT**

1  continues to pay the claims that would not be paid but for Defendants' false and illegal
2  practices.

3      248.  By reason of Defendants' acts, the State of Florida has been damaged, and
4  continues to be damaged, in substantial amounts to be determined at trial.

5      249.  The State of Florida is entitled to the maximum penalty of $11,000 for each and
6  every false or fraudulent claim, record or statement made, used, presented or caused to be
7  made, used or presented by Defendants.

8      250.  This Court is requested to accept supplemental jurisdiction of this related State
9  claim as it is predicated upon the exact same facts as the Federal claims, and merely asserts
10  separate damage to the State of Florida in the operation of its Medicaid program.

## COUNT EIGHT
### (NEW JERSEY FALSE CLAIMS ACT
### N.J.S.A. 2A:32C-3)

13      251.  Relator restates and realleges the allegations in paragraphs 1 through 192 above
14  as if each were stated herein in their entirety and said allegations are incorporated herein by
15  reference.

16      252.  This is a claim for treble damages and penalties under the New Jersey False
17  Claims Act.

18      253.  By virtue of the acts described above, Defendants knowingly presented or caused
19  to be presented, false or fraudulent claims to the New Jersey State Government for payment or
20  approval.

21      254.  By virtue of the acts described above, Defendants knowingly made, used, or
22  caused to be made or used false records and statements, and omitted material facts, to induce
23  the New Jersey State Government to approve and pay such false and fraudulent claims.

24      255.  The New Jersey State Government, unaware of the falsity of the records,
25  statements and claims made, used, presented or caused to be made, used or presented by
26  Defendants, paid and continues to pay the claims that would not be paid but for Defendants'
27  false and illegal practices.

28      256.  By reason of Defendants' acts, the State of New Jersey has been damaged, and

383886

1    continues to be damaged, in substantial amounts to be determined at trial.

2       257.   The State of New Jersey is entitled to the maximum penalty of $11,000 for each

3    and every false or fraudulent claim, record or statement made, used, presented or caused to be

4    made, used or presented by Defendants.

5       258.   This Court is requested to accept supplemental jurisdiction of this related State

6    claim as it is predicated upon the exact same facts as the Federal claims, and merely asserts

7    separate damage to the State of New Jersey in the operation of its Medicaid program.

8                 **COUNT NINE**
              **(NEW YORK FALSE CLAIMS ACT**

9              **N.Y. State Finance Law § 189)**

10       259.   Relator restates and realleges the allegations in paragraphs 1 through 192 above

11    as if each were stated herein in their entirety and said allegations are incorporated herein by

12    reference.

13       260.   This is a claim for treble damages and penalties under the New York False

14    Claims Act.

15       261.   By virtue of the acts described above, Defendants knowingly presented or caused

16    to be presented, false or fraudulent claims to the New York State Government for payment or

17    approval.

18       262.   By virtue of the acts described above, Defendants knowingly made, used, or

19    caused to be made or used false records and statements, and omitted material facts, to induce

20    the New York State Government to approve and pay such false and fraudulent claims.

21       263.   The New York State Government, unaware of the falsity of the records,

22    statements and claims made, used, presented or caused to be made, used or presented by

23    Defendants, paid and continues to pay the claims that would not be paid but for Defendants'

24    false and illegal practices.

25       264.   By reason of Defendants' acts, the State of New York has been damaged, and

26    continues to be damaged, in substantial amounts to be determined at trial.

27       265.   The State of New York is entitled to the maximum penalty of $11,000 for each

28    and every false or fraudulent claim, record or statement made, used, presented or caused to be

1 made, used or presented by Defendants.

2      266.   This Court is requested to accept supplemental jurisdiction of this related State

3 claim as it is predicated upon the exact same facts as the Federal claims, and merely asserts

4 separate damage to the State of New York in the operation of its Medicaid program.

**COUNT TEN**
**(TEXAS MEDICAID FRAUD PREVENTION ACT**
**Tex. Hum. Res. Code Ann. § 36.002)**

7      267.   Relator restates and realleges the allegations in paragraphs 1 through 192 above

8 as if each were stated herein in their entirety and said allegations are incorporated herein by

9 reference.

10      268.   This is a claim for treble damages and penalties under the Texas Medicaid Fraud

11 Prevention Law.

12      269.   By virtue of the acts described above, Defendants knowingly presented or caused

13 to be presented, false or fraudulent claims to the Texas State Government for payment or

14 approval.

15      270.   By virtue of the acts described above, Defendants knowingly made, used, or

16 caused to be made or used false records and statements, and omitted material facts, to induce

17 the Texas State Government to approve and pay such false and fraudulent claims.

18      271.   The Texas State Government, unaware of the falsity of the records, statements

19 and claims made, used, presented or caused to be made, used or presented by Defendants, paid

20 and continues to pay the claims that would not be paid but for Defendants' false and illegal

21 practices.

22      272.   By reason of Defendants' acts, the State of Texas has been damaged, and

23 continues to be damaged, in substantial amounts to be determined at trial.

24      273.   The State of Texas is entitled to the maximum penalty of $11,000 for each and

25 every false or fraudulent claim, record or statement made, used, presented or caused to be

26 made, used or presented by Defendants.

27      274.   This Court is requested to accept supplemental jurisdiction of this related State

28 claim as it is predicated upon the exact same facts as the Federal claims, and merely asserts

separate damage to the State of Texas in the operation of its Medicaid program.

**WHEREFORE,** for the reasons set forth above, Plaintiff/Relator, and on behalf of the United States, respectfully requests that the Court enter an award against MHA as follows:

a.  An Order requiring MHA to cease its violations of the FCA;

b.  An Order entering judgment in favor of the United States and Fox and against MHA in an amount equal to three times the damages the United States has sustained a result of Defendants' actions, as well as a civil penalty against MHA of $11,000 for each violation of the FCA;

c.  An Order awarding to Fox the maximum amount allowed as a "Relator's Share" pursuant to §3730(d) of the FCA;

e.  An Order awarding to Fox and from MHA all reasonable expenses that were necessarily incurred, plus reasonable attorneys' fees and costs; and

f.  An Order awarding to the United States and Fox all such other and further relief as the Court may deem just and proper.

g.  A judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Cal. Govt. Code §12651(a);

h.  A judgment against Defendants in an amount equal to three times the amount of damages the District of Columbia has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of D.C. Code § 2-381.02;

i.  A judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Fla. Stat. Ann. §68.082(2);

j.  A judgment against Defendants in an amount equal to three times the amount of damages the State of New Jersey has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of N.J. Stat. § 2A:32C-3;

k.  A judgment against Defendants in an amount equal to three times the amount of damages the State of New York has sustained because of Defendants' actions, plus a civil penalty of $12,000 for each violation of N.Y. State Fin. §189(1);

///
///
///

l.   A judgment against Defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Tex. Hum. Res. Code Ann. §36.002.

Respectfully Submitted,

Dated: October 25, 2013

LEONARD LAW OFFICES
ENGSTROM LIPSCOMB & LACK

By:
Michael F. Leonard
Paul A. Traina
Attorneys for Plaintiff/Relator

FIRST AMENDED *QUI TAM* COMPLAINT

EXHIBIT 1

EXHIBIT 2

Iatrogenic side effect of Atypical Antipsychotic drugs

| 11 | F12896002 | 3452459556 | Diabetes | | | | | | | | | | | | | Dementia/Cerebral Degeneration[Hypertensive Heart Disease or Hypertension][Cerebral Hemorrhage and Effects of Stroke][Macular Degeneration and Retinal Disorders, Except Detachment and Vascular Retinopathies] |
| 12 | F12450204 | 2624001704 | Stroke | | | | | | | | | | | MAIN LONG TERM CARE NETWORK | | Dementia/Cerebral Degeneration[Acute Myocardial Infarction and Unstable Angina][Hypertensive Heart Disease or Hypertension][Specified Heart Arrhythmias][Asthma and COPD] |
| 13 | F12463654 | 1384607926 | Stroke | | | | | | | | | | | MAIN LONG TERM CARE NETWORK | 1005153444466 | Disorders of Lipid Metabolism [Other Specified Endocrine/Metabolic/Nutritional Disorders][Disorders of the Vertebrae and Spinal Discs][Delirium and Encephalopathy][Dementia/Cerebral Degeneration][Congestive Heart Failure][Acute Myocardial Infarction and Unstable Angina][Specified Heart Arrhythmias][Open-angle Glaucoma][Coronary Atherosclerosis/Other Chronic Ischemic Heart Disease, Unstable Angina, and Other Acute Ischemic Heart Disease][Vascular Disease][Other Specified Heart/Circulatory Conditions] |

EXHIBIT 3